## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL LEONARD VARNER, | : | |
|     Petitioner | : | |
| | : | No. 1:21-cv-00908 |
|     v. | : | |
| | : | (Judge Kane) |
| MORRIS V. HOUSER, | : | |
| SUPERINTENDENT, <u>et</u> <u>al.</u>, | : | |
|     Respondents | : | |

### <u>MEMORANDUM</u>

Petitioner Carl Leonard Varner ("Petitioner"), a state prisoner in the custody of the

Pennsylvania Department of Corrections, commenced the above-captioned action by filing a pro

se petition for a writ of habeas corpus pursuant to the provisions of 28 U.S.C. § 2254 ("Section

2254"). (Doc. Nos. 1, 1-1.) He asserts eight (8) claims for the ineffective assistance of trial

counsel in violation of the Sixth Amendment to the United States Constitution. (<u>Id.</u>) In addition,

he asserts a final claim under the cumulative error doctrine, arguing that trial counsel's

performance was so deficient on those individual claims that, together, they can be aggregated to

demonstrate that his defense at trial was prejudiced by such alleged deficiencies. (<u>Id.</u>) For the

reasons set forth below, the Court finds that Petitioner is not entitled to the extraordinary relief

that he seeks and, thus, the Court will deny his Section 2254 petition and direct the Clerk of

Court to close this case.

I.      **BACKGROUND**

A.      **Petitioner's State Court Proceedings**

The Honorable Judge Carole Van Horn of the Court of Common Pleas of Franklin County, Pennsylvania presided over Petitioner's jury trial, which commenced on December 8, 2014, and concluded on December 17, 2014.  (Doc. Nos. 16-1 at 1; 16-6 at 1.)  Ultimately, the jury found Petitioner guilty of first-degree murder and twenty-five (25) associated counts, including robbery, burglary, conspiracy, kidnapping to facilitate a felony, kidnapping to commit burglary, and unlawful restraint (serious bodily injury).  (Doc. Nos. 1-1 at 13; 16-6 at 45–46.)  As explained by the Pennsylvania Superior Court ("Superior Court"), these counts stemmed from an incident that occurred on October 22, 2012, in Chambersburg, Pennsylvania:

> During the evening of October 22, 2012, two men forced their way into a residence in Chambersburg by brandishing firearms. This residence was home to at least eight men, six of whom were present at the time. None of those present in the home at the time of the break-in spoke English.
>
> After breaking in, the two assailants demanded to see "El Gallo," meaning "the rooster." Finding no satisfaction from the victims' responses, the two men separated the victims into different bedrooms in the home. Both assailants proceeded to rob the victims. One assailant, later identified as Jason Shauf [("Shauf")], fired a shotgun into the ceiling when his demands to see "El Gallo" were not met. The other assailant, [(later identified as Petitioner),] after robbing Hugo Olguin and Augustin Marquez, shot Olguin in the neck with .22 caliber revolver, ultimately resulting in Olguin's death.
>
> After an investigation, police arrested Shauf and [Petitioner]. Pursuant to a search warrant, police found a .22 revolver and a .410 shotgun in the basement of [Petitioner's] residence.
>
> At trial, several of the victims identified [Petitioner] as the man who shot Olguin, as did Shauf.

See Commonwealth v. Varner, No. 208 MDA 2015, 2016 WL 1657475, at *1 (Pa. Super. Ct. Apr. 26, 2016).

Notably, while Petitioner admits that, on October 22, 2012, he had been drinking with Shauf during the day, he has maintained throughout the course of his legal proceedings that he did not accompany Shauf to the Chambersburg residence later that evening. (Doc. No. 1-1 at 13.) He claims that he "was actually drunk and under the influence of elicit [sic] drugs[,]" which caused him to "pass-out" on a couch at Shauf's residence. (Id.)

Petitioner was sentenced on January 7, 2015, to life imprisonment without the possibility of parole, as well as a consecutive term of forty-four (44) to eighty-eight (88) years in prison (Doc. Nos. 1 ¶¶ 2–3; 16 ¶¶ 2–3).[1] Petitioner subsequently filed a notice of appeal and a concise statement of matters complained of on appeal. (Doc. No. 14-1 at 2.) The Superior Court affirmed Petitioner's judgment of sentence on April 26, 2016. See Varner, 2016 WL 1657475, at *3. Petitioner did not seek further review from the Pennsylvania Supreme Court or the United States Supreme Court. (Doc. No. 1 at 2–3.)

Petitioner subsequently moved to dismiss court-appointed counsel. (Doc. No. 14-1 at 3, 42.) Following a hearing, the trial court granted Petitioner's motion and dismissed counsel. (Id.) On April 25, 2017, Petitioner filed a pro se petition pursuant to Pennsylvania's Post Conviction Collateral Relief Act ("PCRA"). (Id.) The trial court appointed counsel to assist Petitioner with his PCRA proceedings, but on July 10, 2017, Petitioner filed a pro se amended petition. (Id.) Petitioner then filed two (2) motions seeking an extension of time in which to file a supplemental PCRA petition, both of which were granted by the trial court. (Id.) On September 25, 2017, Petitioner filed a pro se memorandum in support of his PCRA claims. (Id. at 3.) However, on December 29, 2017, Petitioner filed, through counsel, a notice stating that he would not be filing

---

[1] The jury also convicted Shauf, Petitioner's co-defendant, on twenty-six (26) counts, including second-degree murder. (Doc. No. 16-6 at 46–47.)

a supplemental PCRA petition and, instead, he requested that the trial court incorporate his pro

se amended petition that he filed on July 10, 2017.  (Id. at 3, 42 n.3.)

On April 2, 2018, and July 19, 2018, the trial court held hearings on Petitioner's PCRA

claims.  (Id. at 3, 42–43.)  Particularly relevant here, a number of Petitioner's PCRA claims are

the same claims that he asserts, here, in his Section 2254 petition.  More specifically, those

claims are that his trial counsel were ineffective for failing to: call Jose Espinosa as a witness at

trial; challenge the affidavit of probable case underlying the application for the warrant to search

his residence; pursue a witness identification statement from the crime scene that the perpetrators

were two "black males[;]" challenge the false timeline identification testimony of two (2)

witnesses at trial; comply with state procedural requirements for notice of alibi defense and to

request an alibi instruction; object to the prosecution's presentation of inadmissible testimony of

Petitioner's other crimes, prior bad acts, and mental health issues; ensure Petitioner's right to a

fair and impartial jury by failing to object to the seating of a juror; and object to the prosecutor's

improper and prejudicial remarks during closing argument.  See, e.g., (Doc. No. 41-1 at 4–97).

As will be discussed more fully below, Petitioner did not assert an additional PCRA claim that

trial counsel were ineffective for failing to call Molly Schooly ("Ms. Schooly"), Shauf's

girlfriend, as a witness at trial.  See (id.).

On April 25, 2019, the trial court denied Petitioner's PCRA claims.  (Id. at 39, 43.)

Petitioner filed a timely notice of appeal, as well as an extension of time to file his concise

statement of errors complained of on appeal, which the Superior Court granted.  (Id. at 43.)  On

June 28, 2019, counsel filed a motion to withdraw, and Petitioner subsequently filed a motion to

dismiss counsel so that he could proceed pro se.  (Id.)  Following a hearing, which included a full

colloquy regarding Petitioner's right to counsel, the Superior Court allowed Petitioner to proceed

without counsel in his collateral appeal.  (Id.)   On July 5, 2019, Petitioner filed his concise

statement of errors complained of on appeal, as well as an amended pro se statement on

September 9, 2019.  (Id.)  Nine (9) out of Petitioner's ten (10) PCRA claims alleged ineffective

assistance of counsel.  (Id. at 43–44, 45.)

Thereafter, on July 6, 2020, the Superior Court affirmed the trial court's order denying

Petitioner's request for PCRA relief.  (Id. at 41–56.)  The Pennsylvania Supreme Court denied

Petitioner's allowance of appeal on May 10, 2021.  See Commonwealth v. Varner, 253 A.3d

214, 215 (Pa. 2021).

**B.    Petitioner's Federal Habeas Proceedings**

On May 13, 2021,[2] Petitioner filed his Section 2254 petition, along with a supporting

memorandum of law and various exhibits.  (Doc. Nos. 1 through 1-2.)  By Administrative Order

dated May 21, 2021, Petitioner was advised, in accordance with Mason v. Meyers, 208 F.3d 414

(3d Cir. 2000), that he could have his Section 2254 petition ruled on as filed or he could

withdraw his petition and file one all-inclusive Section 2254 petition within the one-year

statutory period prescribed by the Antiterrorism and Effective Death Penalty Act, Pub.L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  (Doc. No. 5.)  Along with the Administrative Order,

Petitioner was also provided a Notice of Election form.  (Id. at 4.)  He was directed to complete

and file that form within forty-five (45) days, notifying the Court as to how he wished to proceed

in this action.  (Id. at 3.)  The Administrative Order notified Petitioner that, if he did not

---

[2]  Here, Petitioner included a declaration that he placed his petition in the prison mailing system
on May 13, 2021.  (Doc. No. 1 at 15.)  As such, the Court uses May 13, 2021, as the petition's
filing date.  See Pabon v. Mahanoy, 654 F.3d 385, 391 n.8 (3d Cir. 2011) (providing that "[t]he
federal 'prisoner mailbox rule' provides that a document is deemed filed on the date it is given to
prison officials for mailing" (citing Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998))).

complete and return the Notice of Election form within forty-five (45) days, the Court would rule on his Section 2254 petition as filed.  (Id.)

On June 1, 2021, the Administrative Order was returned to the Court as undeliverable because it did not include the control number.  (Doc. No. 6.)  That same day, the Administrative Order was resent to Petitioner.  (Id.)  After forty-five (45) days passed from the date on which the Administrative Order was resent to Petitioner, the Court issued an Order stating that it would rule on his Section 2254 petition as filed.  (Doc. No. 8.)  In addition, the Court directed service of the petition on Morris L. Houser, as well as the Attorney General of the Commonwealth of Pennsylvania and the District Attorney of Franklin County, Pennsylvania.  (Id.)  Respondents were directed to file an answer, motion, or other response to the allegations in the petition within twenty (20) days.  (Id.)

After receiving two (2) extensions of time (Doc. Nos. 10 through 13), Respondents filed, on November 5, 2021, a response and supporting exhibits.  (Doc. Nos. 14, 14-1.)  On November 15, 2021, the Court directed Respondents to mail a new complete copy of their response and exhibits to Petitioner at the appropriate address—i.e., the requisite Smart Communications address in St. Petersburg, Florida.  (Doc. No. 15 at 2; id. at 2 n.2 (noting that Respondents shall also include copies of the transcripts from Petitioner's jury trial and PCRA proceedings).)  In accordance with the Court's Order, Respondents filed a new response, attaching thereto copies of his underlying transcripts.  (Doc. No. 16.)  In response, Petitioner filed motions seeking an extension of time in which to file a traverse, as well as a motion to exceed the page limitation for his traverse.  (Doc. Nos. 18, 20, 22.)  The Court granted his motions (Doc. Nos. 19, 23), and, on February 7, 2022, Petitioner filed his traverse (Doc. No. 24).

On March 30, 2022, the Court, after conducting a thorough review of the matter, issued an Order directing Respondents to submit additional documentation from the underlying state court proceedings.  (Doc. No. 26.)  As reflected by the Court's docket, Respondents did not timely submit such documentation, despite filing an extension of time in which to do so.  (Doc. Nos. 27, 28.)  As a result, on June 28, 2022, Petitioner filed a motion for civil contempt, along with a supporting brief, based upon Respondents' failure to comply with the Court's March 30, 2022 Order.  (Doc. Nos. 29, 30.)  In addition, Petitioner also filed a motion seeking leave to expand the record, along with a supporting brief and corresponding exhibits.  (Doc. Nos. 31, 32.)

The Court subsequently granted Petitioner's motion to expand the record to the extent that he sought to make the documents he attached to his motion a part of the Court's record. (Doc. No. 33 (deeming Doc. Nos. 31-1 through 31-7 a part of the record in this matter).)  In addition, the Court, inter alia, directed Respondents to show cause why sanctions should not be imposed for failure to comply with the Court's prior Orders—that is, for failure to file the documents as previously directed by the Court.  (Doc. No. 34.)  The Court further directed Respondents to file those documents by January 26, 2023.  (Id.)

In response to the Court's directives, Respondent District Attorney of Franklin County filed an answer, representing to the Court, inter alia, that the previously ordered documents would be filed with the Court no later than January 26, 2023.  (Doc. No. 36.)  As a result, the Court denied Petitioner's motion for civil contempt (Doc. No. 29) without prejudice to renewal of the same should Respondent District Attorney of Franklin County fail to timely file such documents or seek a reasonable extension of time in which to do so (Doc. No. 38).  As reflected by the Court's docket, Respondents timely filed the various state court documents.  (Doc. Nos.

41, 42.)  Petitioner subsequently filed a letter addressing those documents.  (Doc. No. 43.)  As

such, Petitioner's Section 2254 petition (Doc. No. 1) is ripe for the Court's disposition.

## II.   LEGAL STANDARD

AEDPA, as codified in statute, provides the legal standard of review for a habeas corpus

petition brought by a person held in custody pursuant to a state-court judgment.  See generally

Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104–132, 110

Stat. 1214, § 104 (codified in relevant part at 28 U.S.C. § 2254).  Section 2254 limits "the power

of a federal court to grant an application for a writ of habeas corpus on behalf of a state

prisoner."  See Cullen v. Pinholster, 563 U.S. 170, 181 (2011).  More specifically, it provides

that a federal court "shall not" grant an application for a writ of habeas corpus with respect to

any claim that was adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

See 28 U.S.C. § 2254(d).  Thus, in accordance with the plain language of Section 2254(d), a writ

of habeas corpus may be granted only under three (3) separate clauses—i.e., (1) the "contrary to"

clause; (2) the "unreasonable application" clause; and (3) the "unreasonable determination" clause.

See id.

Under the "contrary to" clause of Section 2254(d)(1), a federal court may grant the writ

"'if the state court arrives at a conclusion opposite to that reached by [the United States Supreme

Court] on a question of law or if the state court decides a case differently than [the Supreme

Court] has on a set of materially indistinguishable facts.'"  See Werts v. Vaughn, 228 F.3d 178,

196 (3d Cir. 2000) (quoting Williams v. Taylor, 529 U.S. 362, 412–13 (2000)); Penry v.

Johnson, 532 U.S. 782, 792 (2001) (stating that "[a] state court decision will be 'contrary to' our clearly established precedent if the state court either applies a rule that contradicts the governing law set forth in our cases, or confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent" (citation and some internal quotation marks omitted)).

Under the "unreasonable application" clause of Section 2254(d)(1), a habeas petitioner "must persuade a federal court that no fairminded juris[t] could reach the state court's conclusion under [the Supreme Court's] precedents." See Brown v. Davenport, 596 U.S. 118, 135 (2022) (citation and internal quotation marks omitted); see also Keller v. Larkins, 251 F.3d 408, 418 (3d Cir. 2001) (explaining that a federal court may grant the writ under this clause "'if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case'" (quoting Williams, 529 U.S. at 412–13)).

Finally, under the "unreasonable determination" clause of Section 2254(d)(2), the standard "is whether the petitioner has demonstrated by clear and convincing evidence . . . that the state court's determination of the facts was unreasonable in light of the record." See Roundtree v. Balicki, 640 F.3d 530, 537–38 (3d Cir. 2011) (citation, internal citation, and internal quotation marks omitted). "[T]he evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication." Id. at 538 (citation omitted). However, "it is not enough to show that reasonable minds reviewing the record might disagree about the finding in question." See Brown, 596 U.S. at 135 (citation and internal quotation marks omitted). Rather, Section

2254(d)(2) requires federal courts to accord the state court "substantial deference."  <u>See</u>

<u>Brumfield v. Cain</u>, 576 U.S. 305, 314 (2015).

Additionally, federal courts are required to presume that a state court's findings of fact are correct.  <u>See</u> 28 U.S.C. § 2254(e)(1) ("Section 2254(e)") (providing that, in a proceeding commenced by a petition "for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"); <u>see also</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003) (stating that the clear and convincing standard in Section 2254(e)(1) applies to factual determinations by state courts, and "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, [Section] 2254(d)(2)" (citation omitted)).

However, if the petitioner's claimed violations of federal law were not adjudicated on the merits by the state court, and review in federal court is available, then AEDPA's deferential standard, set forth in Section 2254(d) does not apply, and the federal court reviews the claim de novo.  <u>See</u> <u>Cone v. Bell</u>, 556 U.S. 449, 472 (2009) (citations omitted); <u>see also</u> <u>Han Tak Lee v. Glunt</u>, 667 F.3d 397, 403 (3d Cir. 2012) (explaining that, "if the state court did not reach the merits of the federal claims, then they are reviewed <u>de novo</u>" (citing <u>Cone</u>, 556 U.S. at 472)).

## III.   DISCUSSION

In his Section 2254 petition, Petitioner asserts eight (8) claims for the ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. (Doc. Nos. 1, 1-1.)  More specifically, he claims that trial counsel were ineffective for: (1) failing to make a meritorious pretrial objection challenging the misrepresentations within the affidavit of probable cause supporting the warrant to search his residence (Doc. Nos. 1 at 6; 1-1 at 21); (2) failing to call an exculpatory defense witness whose testimony would have rendered a different verdict at his trial reasonably probable (Doc. Nos. 1 at 7; 1-1 at 25); (3) forfeiting complaints about pretrial discovery violations or failing to preserve evidence (Doc. Nos. 1 at 9; 1-1 at 30); (4) failing to adequately impeach two (2) prosecution witnesses (Doc. Nos. 1 at 10; 1-1 at 35); (5) failing to comply with state procedural requirements for notice of alibi defense and failing to request an alibi instruction (Doc. No. 1-1 at 40); (6) forfeiting objections to the prosecution's presentation of the inadmissible testimony of Petitioner's other crimes, prior bad acts, and "mental health stability" (id. at 45); (7) failing to "assure" Petitioner's right to a fair and impartial jury (id. at 51); and (8) forfeiting claims of prosecutorial error by failing to object and request curative admonition where prosecutor purposely made improper and prejudicial remarks during closing argument (id. at 56).  Finally, Petitioner claims that, under the cumulative error doctrine, trial counsel's performance was so deficient on all of these individual claims that, together, these deficiencies can be aggregated to show that they prejudiced Petitioner's defense at trial.  (Id. at 63.)  As for relief, Petitioner requests, inter alia, that the Court issue a writ of habeas corpus and order that he be released from incarceration unless the State decides to hold a new trial within ninety (90) days of the date on which the Court grants habeas relief.  (Id. at 66.)

In the alternative, Petitioner seeks an evidentiary hearing on his claims of ineffective assistance of counsel.  (Id.)

Although Respondents have filed a response to the petition, they assert the tersest of arguments—i.e., that Petitioner's habeas claims were asserted in connection with his PCRA proceedings before the Court of Common Pleas of Franklin County and on appeal to the Superior Court and that, because these claims were ultimately found to be without merit based upon "the applicable law and/or trial counsels' [sic] strategy at trial" (Doc. No. 16 at 4), this Court should affirm the judgment of the state court and deny Petitioner's four (4) grounds for habeas relief (id. at 6).  While Respondents are under the impression that Petitioner asserts only four (4) grounds for habeas relief in this matter (Doc. No. 16 at 4), Petitioner, as set forth above, has asserted nine (9) grounds for relief (Doc. Nos. 1, 1-1).  Much to the Court's dismay, Respondents have not addressed a single one of these nine (9) grounds for relief in any meaningful way.  Nevertheless, the Court has undertaken a thorough review of the voluminous state court record in this matter.  For the reasons discussed below, the Court will deny Petitioner the extraordinary remedy of the federal writ of habeas corpus.

## A.      Standard for Ineffective Assistance of Counsel Claims

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the [a]ssistance of [c]ounsel for his defence."  See U.S. Const. amend VI.  However, "[t]hat a person who happens to be a lawyer is present at trial alongside the accused . . . is not enough to satisfy [this] constitutional command."  See Strickland v. Washington, 466 U.S. 668, 685 (1984) ("Strickland").  Rather, "[t]he Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results."  See

id.  For that reason, the Supreme Court "has recognized that 'the right to counsel is the right to the effective assistance of counsel.'"  See id. at 686 (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)).

To show that a petitioner was denied the effective assistance of counsel, he must satisfy a two (2)-prong standard, as set forth by the Supreme Court in Strickland.  Under the first prong of the Strickland standard, a petitioner must show that "counsel's performance was deficient." See Strickland, 466 U.S. at 687.  This requires a showing that "counsel's representation fell below an objective standard of reasonableness."  See id. at 687–88; Williams, 529 U.S. at 390–91.  Indeed, "[c]ounsel's performance is deficient only "when counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  See McKernan v. Superintendent Smithfield SCI, 849 F.3d 557, 564 (3d Cir. 2017) (quoting McBride v. Superintendent, SCI Houtzdale, 687 F.3d 92, 102 (3d Cir. 2012)).  As explained by the United States Court of Appeals for the Third Circuit ("Third Circuit"), this requires the "reasonably effective assistance" of counsel:

> [Courts] consult no checklist, as no catalog can "satisfactorily take [into] account . . . the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688–89[.] That is why [the courts'] review of counsel's performance is "highly deferential," United States v. McCoy, 410 F.3d 124, 135 (3d Cir. 2005), for "it is all too easy for a court" to find a certain act or omission unreasonable after the defense ultimately proves unsuccessful, Strickland, 466 U.S. at 689[;] see also Rolan v. Vaughn, 445 F.3d 671, 681–82 (3d Cir. 2006) ("[C]ounsel's strategic choices will not be second-guessed by post-hoc determinations that a different trial strategy would have fared better.").

See Rogers v. Superintendent Greene SCI, 80 F.4th 458, 462 (3d Cir. 2023).

Under the second prong of the Strickland standard, a petitioner must show that counsel's "deficient performance prejudiced [his] defense."  See Strickland, 466 U.S. at 687.  "Simply 'show[ing] that the errors had some conceivable effect on the outcome of the proceeding' is not

enough, as '[v]irtually every act or omission of counsel would meet that test.'" Rogers, 80 F.4th at 464 (quoting Strickland, 466 U.S. at 693).  This prong requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." See id.  Thus, the petitioner must show that there is "a reasonable probability that," if not for counsel's errors, "the result of the proceeding would have been different."  See id. at 694.  A reasonable probability, in turn, "is a probability sufficient to undermine confidence in the outcome."  See id.  This "requires a substantial, not just conceivable, likelihood of a different result."  See Cullen, 563 U.S. at 189 (citation and internal quotation marks omitted).

A habeas petitioner must satisfy both prongs and a failure to do so is fatal to his Strickland claims.  See Strickland, 466 U.S. at 687 (stating that "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable"); Dooley v. Petsock, 816 F.2d 885, 889 (3d Cir. 1987).  Additionally, a court is permitted to choose which prong of the Strickland standard to apply first, and a court may reject an ineffective assistance claim on the ground that the petitioner was not prejudiced without ever addressing whether counsel's performance was deficient.  See Strickland, 466 U.S. at 697.  As explained by the Supreme Court in Strickland:

> Although [the Supreme Court has] discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which [the Supreme Court expects] will often be so, that course should be followed.  Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

See id.

For purposes of AEDPA, see 28 U.S.C. § 2254(d)(1), the "clearly established Federal law" as to an ineffective assistance of counsel claim is the two (2)-prong standard established by Strickland.  See Rainey, 603 F.3d at 197 (citation omitted); Cullen, 563 U.S. at 189 (explaining that "[t]here is no dispute that the clearly established federal law" for an ineffective assistance of counsel claim under the Sixth Amendment is Strickland).  Although the Pennsylvania Supreme Court uses slightly different language than that of the United States Supreme Court to address ineffective assistance of counsel claims, the Third Circuit has ruled that Pennsylvania's standard is consistent with the federal standard set forth in Strickland.  See Werts, 228 F.3d at 202–04 (holding that a Pennsylvania state court applying Pennsylvania's ineffective assistance of counsel standard did not contradict Strickland); Jacobs v. Horn, 395 F.3d 92, 106 n.9 (3d Cir. 2005) (citing Werts, 228 F.3d at 204 and noting that the Third Circuit has "previously ruled that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to Strickland")).  And, here, the record establishes that the state courts applied Pennsylvania's standard to Petitioner's PCRA claims of ineffective assistance of counsel.  See (Doc. No. 14-1 at 8 (containing trial court's decision); id. at 45 (containing Superior Court's decision)).

Finally, it bears emphasis that "[s]urmounting Strickland's high bar is never an easy task," see Padilla v. Kentucky, 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of Strickland was unreasonable under [Section] 2254(d) is all the more difficult."  See Harrington v. Richter, 562 U.S. 86, 105 (2011).  Accordingly, when the state court has decided an ineffective assistance of counsel claim on the merits, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'"

15

See Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).  Further, "because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." See id. (citation omitted).  This has been referred to by the Supreme Court as "'doubly deferential.'"  See, e.g., Cullen, 563 U.S. at 190 (explaining that "[w]e take a highly deferential look at counsel's performance . . . through the deferential lens of Section 2254(d)" (citation, internal citation, and internal quotation marks omitted)).  That said, where a petitioner's claimed violations of federal law were not adjudicated on the merits by the state courts, AEDPA's deferential standard, see 28 U.S.C. § 2254(d), does not apply, and the petitioner's claims are reviewed de novo by this Court.  See Cone, 556 U.S. at 472 (citations omitted); Han Tak Lee, 667 F.3d at 40.

### B.   Petitioner's Ineffective Assistance of Counsel Claims

As set forth above, Petitioner contends that his criminal convictions were obtained, and his sentence was imposed, in violation of his right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution.  (Doc. Nos. 1, 1-1.)  In support of this contention, he asserts eight (8) grounds for relief in his Section 2254 petition and accompanying memorandum of law, alleging the ineffective assistance of his trial counsel, namely, Michael Palermo, Esquire ("Attorney Palermo") and Eric Weisbrod, Esquire ("Attorney Weisbrod"). (Doc. Nos. 1-1 at 13; 16-7 at 35.)  The Court addresses Petitioner's eight (8) grounds for relief in turn.

### 1.   Ground One

In Ground One, Petitioner asserts that his trial counsel were ineffective in failing to challenge alleged "misrepresentations" contained in the affidavit of probable cause supporting the warrant to search his residence.  (Doc. No. 1 at 6.)  In support, Petitioner avers that investigators from the Chambersburg Police Department intentionally misrepresented in its application for a search warrant that Shauf, his co-defendant, had stated during an interview that Petitioner possessed firearms and shot the victim at the Chambersburg residence when—Petitioner argues—Shauf never stated this during his interview.  (Doc. No. 1-1 at 12, 22.)

The affiant's probable cause statement supporting the application for the warrant to search Petitioner's residence explicitly states, in relevant part, as follows:

> On 10-23-2012 [Shauf] was interviewed at the Chambersburg [PD].  During this interview[,] Shauf admitted that he and [Petitioner] had gone to 310 East King St. on 10-22-2012.  Shauf stated that [Petitioner] shot the man in the upstairs of the residence.  Shauf further stated that [Petitioner] had taken the gun(s) with him that evening.

(Doc. No. 1-2 at 79.)  In connection with this statement, Petitioner asserts that the issuing authority for the search warrant relied upon these alleged misrepresentations and that, without such alleged misrepresentations, there would have been no grounds for probable cause.  (Doc. No. 1-1 at 22; Doc. No. 1 at 6.)  As a result, Petitioner claims that trial counsel should have sought a "Franks Hearing" but failed to do so.  (Id.)  Petitioner also claims that counsel's failure to do so violated his right to the effective assistance of counsel.  (Id.)  The Court, however, is unpersuaded.

As an initial starting point, the Court notes that there is no indication in the state court record that Petitioner's trial counsel sought a "Franks Hearing" or that the state courts' decisions discussed trial counsel's failure to do so.  See, e.g., (Doc. No. 14-1 at 27 (containing the trial

court's opinion and order, which does not mention or discuss a "Franks Hearing") ; id. at 41–56

(containing the Superior Court's memorandum opinion, which also does not mention or discuss a

"Franks Hearing")).

However, the state courts addressed Petitioner's allegation that his trial counsel failed to

challenge the affiant's statement of probable cause supporting the warrant to search his

residence.  More specifically, the trial court (sitting as the PCRA court) concluded as follows:

> Defendant claims that trial counsel were ineffective for failing to file a habeas
> corpus petition to challenge the affidavit of probable cause underlying the search
> warrant and criminal complaint.  Attorneys Weisbrod and Palermo testified that
> their professional opinion was that a habeas corpus motion would not have been
> successful because a preliminary hearing had been held where all the charges
> were bound over to the Court of Common Pleas.  Testimony also showed that
> [Petitioner's] request to counsel that they file the motion occurred just prior to
> the beginning of his trial.  This Court finds no merit to the claim that counsel
> was ineffective for failing to file a habeas corpus motion with the Court because
> counsel's omission in this case had a reasonable basis to advance Defendant's
> interests.

(Id. at 27.)  And, on appeal, the Superior Court affirmed the trial court's decision, stating:

> At the PCRA hearing, [Petitioner's] trial attorneys testified that they believed a
> motion to challenge the affidavit of probable cause would have been
> unsuccessful based on the fact that a full preliminary hearing had been held in
> the case, after which all charges were bounded over for trial. Under the
> circumstances, we agree that any such motion would have been frivolous.  See
> Commonwealth v. Chamberlain, 30 A.3d 381, 423 (Pa. 2011) (any issue
> concerning defect in affidavit of probable cause becomes moot upon district
> justice's finding at preliminary hearing that prima facie case has been
> established).  Thus, this claim is meritless.

(Doc. No. 14-1 at 46 (internal citation omitted)); see also (Doc. No. 16-8 at 23–25, 59–62

(containing counsel's testimony from PCRA hearing)).

Thus, under these circumstances, where it is unclear whether AEDPA's deferential

standard would apply to the state court's decision on this ineffective assistance claim, see 28

U.S.C. § 2254(d), the Court will bypass the issue and simply conduct a de novo review since

Petitioner is not entitled to habeas relief on this claim under such de novo review.  See Hannibal v. Sec'y Pennsylvania Dep't of Corr., No. 21-3075, 2024 WL 1422015, at *7 (3d Cir. Apr. 2, 2024) (unpublished) (stating that "when a state court's rationale is less than clarion, it is permissible to sidestep AEDPA deference if the claim would fail under de novo review" (citing Berghuis v. Thompkins, 560 U.S. 370, 390 (2010))).  As explained by the United States Supreme Court:

> Courts cannot grant writs of habeas corpus under § 2254 by engaging only in de novo review when it is unclear whether AEDPA deference applies, § 2254(d). In those situations, courts must resolve whether AEDPA deference applies, because if it does, a habeas petitioner may not be entitled to a writ of habeas corpus under § 2254(d).  Courts can, however, deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a).

See Berghuis, 560 U.S. at 390; see also Knowles, 556 U.S. at 114 (explaining that, "[w]hether reviewed under the standard of review set forth in § 2254(d)(1) or de novo, [the habeas petitioner] failed to establish that his counsel's performance was ineffective . . . ").

However, the Court notes that, "[e]ven under de novo review, the standard for judging counsel's representation is a most deferential one."  See Harrington, 562 U.S. at 105.  Indeed, "[u]nlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence."  See id. (citation and internal quotation marks omitted).

Assuming arguendo that trial counsel were objectively unreasonable in failing to move for a "Franks Hearing" before trial, the Court finds that Petitioner was not prejudiced by trial counsel's failure to do so.  The United States Supreme Court has expressly recognized the long-standing "presumption of validity" with respect to affidavits of probable cause supporting search

19

warrants.  See Franks v. Delaware, 438 U.S. 154, 171 (1978) ("Franks").  In Franks, however, the Supreme Court held that a criminal defendant can, under certain circumstances, dispute the truthfulness of an affiant's factual statements in the affidavit of probable cause supporting a search warrant.  See id. at 155–56; see also United States v. Yasuf, 461 F.3d 374, 383 (3d Cir. 2006) (explaining that the Franks Court "created a mechanism to allow a defendant to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid").  In pertinent part, the Supreme Court explained that, where a criminal defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  See Franks, 438 U.S. at 155–56.

Here, the Court finds that the affiant's representations in the statement of probable cause supporting the application for the warrant to search Petitioner's residence constitute a fair reading, or reasonable understanding, of the actual statements in Shauf's interview with the investigators at the Chambersburg Police Department.  In reaching this finding, the Court has not only reviewed Shauf's videotaped interview with the investigators on October 23, 2012 (Doc. No. 42), but has also read the transcript of that interview in its entirety (Doc. No. 31-7).  During that interview, Shauf made statements to the effect that: he was with Petitioner on October 22, 2012 (Doc. No. 31-7 at 4); Petitioner had "beef" with people at 310 East King Street, the Chambersburg residence in question (id. at 11, 13, 37); Petitioner wanted to go to the residence to "confront" those people (id. at 39); he and Petitioner went to the residence on October 22, 2012 (id. at 13–14, 37, 43–44); Petitioner had two (2) guns with him when they went into the residence (id. at 24–25, 40–41, 43); while they were inside the residence, Petitioner went upstairs

with the guns (id. at 45–46, 48–49); he heard gun shots while Petitioner was upstairs with the guns (id. at 15–16, 21–22, 26–27, 49–52, 60–63); and he admitted that "[Petitioner] fucking shot" (id. at 65); and he did not know that Petitioner was "going to shoot the guy" (id. at 21); see also (id. 15, 21, 27, 30, 65).

Accordingly, the Court concludes that the affiant's representations in the underlying statement of probable cause supporting the application for the warrant to search Petitioner's residence (i.e., that Petitioner took guns into the residence and shot the victim) constitute a fair reading, or reasonable understanding, of the actual statements that Shauf made to investigators during his interview with investigators at the Chambersburg Police Department. Stated differently, the Court discerns no false statement in the affiant's statement of probable cause. As a result, the Court cannot conclude that a Franks hearing would have resulted in the suppression of any evidence obtained from Petitioner's residence via the search warrant. Accordingly, the Court will deny Petitioner's request for habeas relief in Ground One of his petition.

## 2.      Ground Two

In Ground Two of his petition, Petitioner asserts that trial counsel were ineffective in failing to call two (2) defense witnesses at trial—namely, Jose Espinosa ("Mr. Espinosa") and Ms. Schooly. (Doc. No. 1 at 7–9.) In support, Petitioner alleges that Mr. Espinosa would have discredited the prosecution's case—i.e., that the witnesses were able to view and accurately identify the perpetrators. (Id. at 7; Doc. No. 1-1 at 25 (averring that Mr. Espinosa's testimony would have addressed "the use of drugs and alcohol" on the evening in question, as well as the layout of and poor lighting in the Chambersburg residence).) In addition, Petitioner alleges that Ms. Schooly would have discredited the prosecution's case that he was physically present at the Chambersburg residence during the time of the crimes. (Id. at 26 (claiming that Ms. Schooly's

alibi witness testimony would have been compelling as she lived in the residence "where Petitioner asserts he was sleeping on the couch in a drug induced and drunken state" on the night in question).)

### a.   Mr. Espinosa

With respect to Petitioner's ineffective assistance claim concerning Mr. Espinosa's purported testimony, the Court recounts the state court record.  In the trial court's opinion denying Petitioner PCRA relief on this claim, the trial court (sitting as the PCRA court) found as follows:

> Through counsel, Defendant claims that the lack of Espinosa's testimony "definitely prejudiced Defendant."  Espinosa testified at the PCRA hearing that he knew the individuals in the house at the time of the incident including the victim, and was familiar with the layout of the house.  Espinosa testified at the PCRA hearing that he had been present at the home just prior to the incident and testified to the drug and alcohol use taking place. Defendant claims this testimony at trial would have been significant to show impairment of the Commonwealth's witnesses, thus creating doubt about the veracity and accuracy of their testimony. Defendant claims that Espinosa's knowledge of the conditions in the house would have been significant because he would have testified to the low light levels in the home, creating even more doubt in the Commonwealth witnesses' testimony.  Lastly, Espinosa testified at the PCRA hearing that he had heard statements from the Commonwealth witnesses indicating they wanted someone held accountable for their friend's death.

> * * * *

> The Commonwealth concedes that Espinosa existed and was available, that counsel was informed of his existence, and that he was prepared to cooperate and testify at trial.  The gravamen of the claim rests on whether the absence of testimony was so prejudicial to Defendant that it denied him a fair trial. Defendant claims that Espinosa's testimony about the Commonwealth's witnesses' drug and alcohol use, the layout and lighting of the scene of the crimes, and the conversation with the other witnesses after the incident would have cast enough doubt on the veracity of the Commonwealth witnesses so as to impact the outcome of the trial.  This Court does not agree.

> During the trial, the jury heard testimony regarding the use of alcohol and illegal drugs at the house on the evening of the crime.  Trial counsel testified at the PCRA hearing that Espinosa's testimony would have been helpful, but only

testimony regarding Espinosa's observations, meaning the testimony about the alcohol and drug use.  The Court does not believe, however, that cumulative evidence on this point would have persuaded the jury that the Commonwealth's witnesses were unreliable.

Regarding testimony about the lighting and layout of the house, we find that testimony from Espinosa about the lighting of the inside of the house would not have swayed the jury and the lack of this evidence was not so prejudicial that it denied Defendant a fair trial.  Lastly, Espinosa's PCRA hearing testimony about a conversation he had with witness Gallo would have been inadmissible hearsay at trial, so this testimony would not have been allowed even if Espinosa had been called to testify at the trial on the other matters.  Trial counsel for Defendant alluded to this fact at the PCRA hearing when he testified that testimony from Espinosa about his observations "could have possibly been helpful," but "not what he heard, but his observations."  For these reasons, this Court finds that trial counsel was not ineffective at trial for failing to call . . . Espinosa as a witness since his testimony would not have impacted the trial outcome.

(Doc. No. 14-1 at 11–12.)  On appeal, the Superior Court affirmed the PCRA court's denial of

this claim, as follows:

When raising a failure to call a potential witness claim, a PCRA petitioner must establish that:

(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

Commonwealth v. Washington, 927 A.2d 586, 599 (Pa. 2007).

Attorney Weisbrod testified at the PCRA hearing that his office had prepared a trial subpoena for Espinosa; however, counsel could not recall why Espinosa did not testify. Although Espinosa existed, was available to testify, and counsel was aware of him, Washington, supra, the PCRA court determined that the absence of Espinosa's testimony was not so prejudicial so as to deny [Petitioner] a fair trial. Specifically, the court found that the [sic] Espinosa's testimony would have been cumulative of other individuals' testimony that the occupants of the Chambersburg residence were drinking heavily and using illegal drugs on the night of the incident. Because the jury heard evidence of the drug and alcohol use from other witnesses and any other information [Petitioner] claims Espinosa would have offered would have been inadmissible hearsay, [Petitioner] was not prejudiced by the absence of Espinosa's testimony. Thus, there is no merit to this claim.

(Id. at 46–47.)

### i.       Alcohol and Illicit Drugs

As for Mr. Espinosa's purported testimony concerning the use of alcohol and illicit drugs at the Chambersburg residence, the basis of the Superior Court's decision was that this witness's testimony would have been cumulative.  Having reviewed the state court record, the Court cannot conclude that the Superior Court's adjudication on the merits was an unreasonable application of Strickland or based upon an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  Indeed, witnesses at the Chambersburg residence testified as to the drinking that occurred on the day in question, and the forensic pathologist testified as to the metabolite of cocaine found in the victim's blood.  See, e.g., (Doc. Nos. 16-1 at 34; 16-2 at 12, 14; 16-4 at 55–56).  Based upon this testimony, the jury was aware that there was reason to question the accuracy of the witnesses' observations of the perpetrators (i.e., Petitioner and his co-defendant).  Because the Court cannot conclude that Mr. Espinosa's testimony on this point would have added anything of significance to the other evidence before the jury, Petitioner has not demonstrated a reasonable probability that the outcome of his trial would have been different had Mr. Espinosa been called to testify as a witness.  See Brown v. Wenerowicz, 663 F.3d 619, 631 (3d Cir. 2011) (concluding that "it was not unreasonable for the . . . Superior Court to conclude that there was no prejudice under Strickland because the excluded testimony would have been 'merely cumulative'"); see also Hanson v. Sherrod, 797 F.3d 810, 832 (10th Cir. 2015) (observing, in the Strickland context, that "[m]any of our cases have refused to find prejudice when the evidence not presented would have been cumulative of the evidence the jury already heard" (citing Grant v. Trammell, 727 F.3d 1006, 1022 (10th Cir. 2013) (listing cases)); Garza v. Stephens, 738 F.3d 669, 680 (5th Cir. 2013) (concluding that the habeas petitioner failed to show

that the state court's conclusion involved an unreasonable application of Strickland or an unreasonable determination of the evidence where petitioner's counsel had elicited the same sort of information from other witnesses).

**ii.**   **Lighting and Layout**

As for Mr. Espinosa's purported testimony concerning the lighting and layout of the Chambersburg residence, the Court observes that this specific aspect of Mr. Espinosa's testimony was addressed only by the PCRA court, and not by the Superior Court.  (Doc. No. 14-1 at 11–12, 46–47.)  In other words, the PCRA court's decision concerning this specific aspect of Mr. Espinosa's testimony was left undisturbed on appeal.  As a result, the Court reviews the PCRA court's decision under AEDPA's deferential standard set forth in Section 2254(d).  See 28 U.S.C. § 2254(d); see also Saranchak v. Sec'y, Pa. Dep't of Corr., 802 F.3d 579, 597 (3d Cir. 2015) (concluding that "[t]he lack of an express ruling from the Pennsylvania Supreme Court on the question of prejudice does not negate the PCRA court's decision that [petitioner] was not prejudiced[,]" and, therefore, the federal court "must view the PCRA court's conclusion on that prong through AEDPA's lens" (citation and internal quotation marks omitted)); Collins v. Sec'y of Pennsylvania Dep't of Corr., 742 F.3d 528, 544–45 (3d Cir. 2014) (stating, as follows: "[w]e conclude that the broader claim was presented to and adjudicated on the merits by the state courts, and that the narrower focus of the Pennsylvania Supreme Court on ballistics evidence does not affect our standard of review").

The basis of the PCRA court's decision was that the purported lighting and layout testimony from Espinosa would not have swayed the jury and that, therefore, the lack of this evidence at Petitioner's trial was not so prejudicial that it denied him a fair trial.  Having reviewed the state court record, the Court cannot conclude that the PCRA court's adjudication on

25

the merits was an unreasonable application of <u>Strickland</u> or based upon an unreasonable

determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d).

Although unclear, Petitioner's habeas petition appears to challenge the testimony of only

one of the Commonwealth's witnesses who was present at the Chambersburg residence during

the time of the crimes—<u>i.e.</u>, Arturo Rubio Perez ("Mr. Perez").  In support of his challenge,

Petitioner asserts that it would have been a "physical impossibility" for Mr. Perez to have

witnessed "what occurred in the victim's bathroom from the victim's bedroom."  (Doc. Nos. 1 at

7; 1-1 at 27 (disputing that Mr. Perez could have "somehow" identified Petitioner who allegedly

was in another room).)  Petitioner seems to suggest that Mr. Espinosa's testimony, concerning

the lighting and layout of the Chambersburg residence, would have refuted Mr. Perez's

testimony, had Mr. Espinosa been called to testify.

Even assuming <u>arguendo</u> that Petitioner could establish that Mr. Perez did not have the

best "angle[ ] of view" in the Chambersburg residence (Doc. No. 1-1 at 27), Petitioner has not

accounted for additional testimony from the other individuals who were also present at the

Chambersburg residence during the time of the crimes.  For instance, the state court record

reflects that the Commonwealth presented witness testimony from Augustin Macias Marquez

("Mr. Marquez"), who stated, in relevant part, that: Petitioner forced him upstairs and took him

into a bedroom where the victim was located and proceeded to rob them at gunpoint; Petitioner

then forced him and the victim from the bedroom and led them down the hallway, where

Petitioner shot the victim.  (Doc. No. 16-1 at 39–40.)  Mr. Marquez also stated that he was only

about twelve (12) inches from the victim when Petitioner shot the victim.  (<u>Id.</u> (explaining that

the victim was about a foot in front of Mr. Marquez and that Petitioner was close and to the side

of Mr. Marquez).)  Finally, Mr. Marquez testified that, after the victim was shot, he "fell" into the bathroom and "in the bathtub."  (Id. at 39.)

Thus, the jury was presented with additional evidence at trial that another individual at the Chambersburg residence was in very close proximity to Petitioner when he observed Petitioner shoot the victim.  As a result, even if Petitioner could have presented Mr. Espinosa's testimony concerning the lighting and layout of the residence in order to refute Mr. Perez's observations on the day in question, the jury would still have been free to believe the eyewitness testimony of Mr. Marquez.  Because of this, it was reasonable for the PCRA court to conclude that Petitioner cannot show a reasonable probability that the outcome of his trial would have been different had trial counsel called Mr. Espinosa to testify as a witness at trial.[3]  The Court will, therefore, deny Petitioner's request for habeas relief in Ground Two of his petition concerning trial counsel's failure to call Mr. Espinosa as a witness at trial.

### b.    Ms. Schooly

With respect to Petitioner's ineffective assistance claim concerning trial counsel's failure to call Ms. Schooly as a witness at trial, the Court finds that Petitioner did not present this claim to the state courts, see, e.g. (Doc. Nos. 41-1 through 41-3), and, thus, did not exhaust this claim at the state court level before filing his Section 2254 petition in this Court.[4]  See 28 U.S.C. §

---

[3]  The Court notes that, at Petitioner's PCRA hearing, the trial court (sitting as the PCRA court) explicitly noted that "[t]here was a lot of testimony in the record about the layout of the home, the photos of the home[,]" and, from what the court could recall offhand, "there was a diagram that the police officers did of the layout of the home."  (Doc. Nos. 16-7 at 90); see also (Doc. No. 16-1 at 3, 20–23, 32 (containing the trial transcript, which reflects that numerous photos were presented at trial, and ultimately entered into evidence, depicting the inside of the Chambersburg residence)).

[4]  Petitioner's pro se PCRA petition, filed on April 25, 2017 (Doc. No. 41-1 at 4–36), pro se amended PCRA petition, filed on July 10, 2017 (id. at 37–78), and supporting briefs (Doc. Nos. 31-4 at 42–118; 31-5 at 1–104, 106–125) did not assert this claim of ineffective assistance of

2254(b)(1)(A) (explaining that a petition for a writ of habeas corpus, filed "on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that" the petitioner "exhausted the remedies available in the courts of the State . . . "); <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004) (explaining that, "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights'" (quoting <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995))).

However, if state procedural rules bar the petitioner from seeking further relief in state courts, "the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" <u>See</u> <u>McCandless v. Vaughn</u>, 172 F.3d 255, 260 (3d Cir. 1999) (quoting 28 U.S.C. § 2254(b)). "Even so, this does not mean that a federal court may, without more, proceed to the merits." <u>Lines v. Larkins</u>, 208 F.3d 153, 160 (3d Cir. 2000); <u>see also</u> <u>Martinez v. Ryan</u>, 566 U.S. 1, 9 (2012) (explaining that, under the procedural default doctrine, a federal habeas court "will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule" (listing cases)).

However, this doctrine "is not without exceptions." <u>See</u> <u>id.</u> at 10. A state prisoner "may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." <u>See</u> <u>id.</u> (citation omitted); <u>Lines</u>, 208 F.3d at 160. A state prisoner may also obtain federal review of a defaulted claim by showing that a failure to consider the claim will result in a "fundamental miscarriage of justice." <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S.

---

trial counsel. In addition, neither Petitioner's concise statement of errors complained of on appeal, nor amended concise statement of errors complained of appeal, discussed this claim of ineffective assistance of counsel. (<u>Id.</u> at 81–84, 87–94.) Finally, Petitioner's brief filed in support of his appeal to the Superior Court did not raise this claim. (<u>Id.</u> at 99–137.)

722, 750 (1991); see also Leyva v. Williams, 504 F.3d 357, 366 (3d Cir. 2007) (explaining that, ordinarily, a petitioner must show "actual innocence" in order to satisfy the "fundamental miscarriage of justice" exception (citation omitted)).

As it is now too late for Petitioner to return to the state courts to exhaust this ineffective assistance claim, see 42 Pa.C.S. § 9545(b)(1) (containing the PCRA's one-year statute of limitations)), the Court concludes that this claim is procedurally defaulted.  See Collins, 742 F.3d at 542 (stating that "[a] claim is procedurally defaulted if the petitioner failed to exhaust that claim in state court and if state procedures prohibit the petitioner from later presenting the claim in state court" (citations omitted)).  Petitioner, however, has not alleged or shown the sort of cause and prejudice that is necessary to excuse this procedural default, or alleged or shown that the failure to consider his instant habeas claim will result in a fundamental miscarriage of justice. As a result, the merits of Petitioner's ineffective assistance claim concerning Ms. Schooly's purported testimony are not properly subject to this Court's review.  See generally Coleman, 501 U.S. at 749–50 (explaining that a petitioner's procedurally defaulted federal claims are barred from habeas review unless the petitioner can demonstrate cause for the default and prejudice as a result of the alleged violation of federal law, or the failure to review his federal claims will result in a miscarriage of justice); Martinez, 566 U.S. at 9 (explaining that "[f]ederal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism[,]" and that "[t]hese rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule" (citations omitted)).  Accordingly, the Court

will deny Petitioner's request for habeas relief in Ground Two of his petition concerning trial counsel's failure to call Ms. Schooly as a witness at trial.

### 3.    Ground Three

In Ground Three of his petition, Petitioner asserts that his trial counsel were ineffective in failing to pursue the prosecution's destruction or failure to preserve evidence concerning a witness's identification statement from the scene of the crime.  (Doc. No. 1 at 9.)  In support, Petitioner alleges that Chambersburg Police Department Officer Dimoff prepared a police report (Doc. No. 1-1 at 30–31), which references a witness's statement that there were two (2) perpetrators at the scene of the crime and that they were "black" (Doc. No. 1-2 at 85).  Petitioner, who testified that he is "not black" (Doc. No. 16-7 at 51 line 13), has attached Officer Dimoff's report (or at least one page of that report) to his Section 2254 petition.  It provides in relevant part as follows:

> On the date and time listed, I began responding to the area of E King St and S Third St for some type of assault.  [Officer] Fegan immediately relayed that he observed a male running south on Harrison Ave.  As [Officer] Rodgers and I began leaving the [Chambersburg PD] parking lot, [Officer] Fegan stopped the male that was running and we assisted him.  After a quick search, the H/M[5] mentioned the address of 310 E King St.  [Officer] Rodgers and I immediately responded to that address while [Officer] Fegan detained the H/M and transported him to this address.
>
> While enroute, [Officer] Bietsch requested medics along with other officers. When we arrived, there were 4 H/M's standing outside the front of the residence. [Sergeant] Clawson entered the residence to assist [Officer] Bietsch while [Officer] Rodgers and I separated and searched the 4 H/M's.  I then attempted to gather their information along with any idea of what may have happened.  Due to the language barrier, I was only able to obtain very limited information. Through broken English and hand gestures, I was able to obtain that a home invasion robbery may have just occurred and someone may have been shot. The one H/M (no shirt) stated that there were 2 actors and that they were Nego (black).  I then spoke with another H/M (white printed t-shirt) who made it sound

---

[5]  Based upon the record before the Court, including similar reports from other Chambersburg PD Officers (Doc. No. 1-2 at 90), H/M signifies "Hispanic Male."

as though he may have been a victim of a robbery.  This H/M stated that the 2 actors were blanco (white).  Through his gestures and broken English, he stated that the two Blanco (white) male actors banged on the door before forcing their way in.  The one actor held a gun up to his head and forced him to give him his money.  The actors then went upstairs and he heard a gun shot.

I then went to the crowd of people that had formed at the corner of E King St and Kennedy St to check for witnesses.  Miguel Villalobos immediately stepped forward.  He stated that approximately 20-30 minutes prior to our arrival, he was driving through the area.  He was in a vehicle and at the stop sign on S Third St waiting to turn east on King St.  <u>While there, a tall thin black male know[n] to him as "Blue" was standing on the corner.</u>  He also recalled seeing a silver van in the parking lot across from him with its reverse lights on.  "Blue" then waived him through the intersection as <u>though he was with the person in the silver van</u> . . . .

(Doc. No. 1-2 at 84–85 (emphasis in original).)

In connection with Officer Dimoff's report, Petitioner believes that there must have been additional statements or police notes/reports about the witness who stated that the "actors" were two (2) "black" males.  (Doc. No. 1-1 at 31.)  For that reason, Petitioner asserts that his trial counsel should have held the prosecution "accountable" for destroying or otherwise failing to preserve such exculpatory evidence.  (<u>Id.</u>; <u>id.</u> at 34 (stating that this evidence exonerates Petitioner as it "was a cross-racial identification").)  Petitioner further asserts that the prosecution's destruction of or failure to preserve this evidence violates the dictates of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  (<u>Id.</u> at 32.)  Finally, Petitioner asserts that, in an attempt to conceal the destruction of such exculpatory evidence, this witness statement was later mischaracterized by both the prosecution and the trial court as "'two black males in the vicinity,' when the actual statement[ ] reveal[s] that two black males committed the crime."  (<u>Id.</u> at 31.)

Based upon all of these assertions, Petitioner contends that his trial counsel should have pursued a number of avenues with respect to the witness's statement, but that they failed to do so, thereby violating his right to the effective assistance of counsel.  (<u>Id.</u> at 32, 34 (contending

that trial counsel should have: raised this issue before the trial court and sought the production of

this exculpatory evidence; impeached prosecution witness testimony in order to reveal such

exculpatory statements; requested the trial court to admonish the prosecution for failing to

preserve this exculpatory evidence; and sought a jury instruction from the trial court as to this

identification testimony).)

 With respect to this ineffective assistance claim, the Superior Court stated in its July 6,

2020 decision, as follows:

> [Petitioner] next asserts that trial counsel were ineffective for failing to pursue
> witness identification testimony from the crime scene;—specifically a reference
> in a police report indicating that two black men were seen in the vicinity of the
> crime scene on the night in question. He claims such testimony was material to
> his innocence, and that the prosecution withheld this vital information in
> violation of <u>Brady</u>[.]
>
> Chambersburg Police Officer Victor Dimoff allegedly prepared a police report
> referencing two black men being seen in the vicinity of the crime scene on the
> night of the incident. At the PCRA hearing, Attorney Palermo testified that he
> believed the officer's notes had been requested, but they did not exist.
> [Petitioner], himself, indicated that the defense had, in fact, filed a motion to
> compel the officer's notes, which was granted . . . . However, Attorney Palermo
> testified that Attorney Weisbrod told him that the notes did not exist and,
> therefore, could not be provided by the Commonwealth . . . . Attorney Weisbrod
> also testified that the defense subpoenaed Officer Dimoff and called him as a
> witness at trial . . . . Because counsel filed a motion to compel and subpoenaed
> Officer Dimoff to be a witness at [Petitioner's] trial, the underlying
> ineffectiveness claim has no merit . . . . Moreover, because counsel testified that
> the notes did not exist, [Petitioner's] <u>Brady</u> claim is moot.

(Doc. No. 14-1 at 47–48 (internal citations omitted).)

 Accordingly, the apparent basis for the Superior Court's rejection of this ineffective

assistance claim is that trial counsel made reasonable efforts to obtain Officer Dimoff's notes

that might have revealed the identity of the witness who reported seeing two (2) black men.

Having reviewed the state court record, the Court cannot conclude that the Superior Court's

adjudication on the merits was an unreasonable application of <u>Strickland</u> or based upon an unreasonable determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d).

At the PCRA hearing, Petitioner conceded that his trial counsel had filed a motion to compel the relevant notes (Doc. No. 16-7 at 50), that the motion was granted, and that the Commonwealth was directed to produce the relevant notes, to the extent that they existed (<u>id.</u> at 50–51).  Also at the PCRA hearing, Petitioner's counsel stated that it was their understanding that the Commonwealth did not produce any such notes because they did not exist.  More specifically, Attorney Palmero testified at the hearing as follows:

> Q    So you were informed that the police department was not in possession anymore of notes to provide to you or Attorney Weisbrod?
>
> A    The physical pen-on-paper notes, correct, did not exist.
>
> Q    [Petitioner's] impression was that the District Attorney's Office said no, you're not entitled to them.  Did that ever occur?
>
> A    I don't know what his impression was.  That was my impression[,] they didn't exist.  That might have been because Mr. Weisbrod is local to Chambersburg.  That's something maybe he would have been boots on the ground and inquiring of the officers or his staff would have.

(Doc. No. 16-8 at 29–30.)[6]   In addition, Attorney Weisbrod similarly testified at the PCRA hearing, as follows:

_____

[6]  In Attorney Palmero's experience with these types of requests for the production of police notes, he explained that:

> A    So I do have an omnibus motion where I ask for [police] notes.  A lot of times the answer at the local level is they don't exist anymore because those notes get transcribed in a report and the notes are destroyed.

(Doc. No. 16-8 at 29.)

Q        [Y]ou did file a motion to compel.  And that was granted.  Police notes were to be handed over, if any.  Do you recall discussion you had with the DA's Office about those police notes?

A        That they didn't exist was the discussion.

Q        So your understanding was that those notes did not exist?

A        That is my understanding.

(Id. at 64.)

Attorney Weisbord also testified, however, that he would have expected such police notes to exist and, thus, he and Attorney Palmero subpoenaed Officer Dimoff to testify at Petitioner's trial.[7]  (Id. at 65.)  At trial, Officer Dimoff was questioned about his report, and he testified, on two (2) separate occasions, that one of the witnesses he had spoken with at the scene of the crime thought that there were two (2) "black males" that had gone to the Chambersburg residence on the evening in question.  (Doc. No. 16-5 at 4, 5.)  However, Officer Dimoff also testified that another one of the witnesses he had spoken with stated that these individuals were "white."  (Id. at 5.)

Thus, while the Court understands Petitioner's argument (i.e., that Officer Dimoff's police report references a witness statement that the alleged perpetrators were, essentially, a different race from Petitioner and that Petitioner was never provided the identity of this witness), Officer Dimoff's report specifically explains that he was able to obtain only "very limited

---

[7]  In Attorney Weisbord's experience with these types of requests for the production of police notes, he explained that:

A        In the normal course of police work, oftentimes, they will keep those notes and keep them until after trial even though they do supplemental reports oftentimes.  So I would expect—I would expect they exist.

(Doc. No. 16-8 at 65.)

information" from such witnesses based upon the "broken English." (Doc. No. 1-2 at 85.) In addition, Officer Dimoff's <u>same</u> police report references a witness statement that the two (2) perpetrators were "white." (<u>Id.</u>) And, finally, while the identity of this witness referenced in Officer Dimoff's report is unknown, the state court record, upon which the Superior Court relied, reflects that witnesses who were physically present inside the subject residence at the time of the crimes testified that the ethnicity of the two (2) perpetrators was "white." <u>See, e.g.,</u> (Doc. Nos. 16-1 at 40; 16-2 at 10). Accordingly, for all of these reasons, the Court will deny Petitioner's request for habeas relief in Ground Three of his petition.

### 4.    Ground Four

In Ground Four of his petition, Petitioner asserts that his trial counsel were ineffective for failing to adequately impeach two (2) witnesses presented by the Commonwealth—Mr. Perez and Mr. Marquez. (Doc. No. 1 at 10.) In support, Petitioner alleges that, during his trial, the testimony of these two (2) witnesses misled the jury to believe that they had identified Petitioner right after the crime, on October 22, 2012, when they did not actually identify Petitioner until four (4) days after the crime on October 26, 2012, during a photo array prepared by the police. (<u>Id.</u>) Petitioner alleges that this photo array contained a picture of him that had previously been printed in a local newspaper, identifying him as one of the suspects being investigated. (<u>Id.</u>; Doc. No. 1-1 at 36–37.) Petitioner alleges that, because of this, Mr. Perez and Mr. Marquez were "tainted" by the media coverage. (<u>Id.</u> at 37.) In addition, Petitioner alleges that, even though his trial counsel were aware of the misleading testimony elicited by the prosecution at trial, they did not adequately impeach these witnesses on cross-examination. (Doc. Nos. 1 at 10; 1-1 at 38, 39– 40 (stating that the perjured testimony involved prosecutorial misconduct, that trial counsel had a

duty to correct the perjured testimony, and that this led to corruption of the truth-seeking

function of the trial).)

In support of these allegations, Petitioner points to two (2) police reports, concerning Mr.

Perez and Mr. Marquez.  (Id. at 37.)  In relevant part, the police report concerning Mr. Perez

provides as follows:

> On 10-26-2012 at approx. 0922 hrs [Perez] was shown a photo array which
> included a photo of [Petitioner].  [Perez] was provided with the same series of
> instructions prior to viewing the array (which included carefully viewing each
> photo and that the suspect may or may not be represented within the array).
> After approx. 10 seconds [Perez] pointed at the photo of [Petitioner].   He
> confirmed that he was confident in identifying [Petitioner] as one of the suspects.
> He further stated that [Petitioner] was the suspect who shot the victim.
> [Petitioner] wrote his initials "A.R.P." directly above the photo of [Petitioner]
> as confirmation of this identification.
>
> Upon completion of the viewing of the array, [Perez] was asked if he has seen a
> photo of [Petitioner] presented by any type of media coverage.  [Perez] stated
> that he has not.  He then confirmed that he recognizes the photo (of [Petitioner])
> solely from his interaction with him on the date of the incident.

(Doc. No. 1-2 at 93.)  And, the police report concerning Mr. Marquez similarly provides as

follows:

> On 10-26-2012 at approx. 1000 hrs [Marquez] was shown a photo array which
> included a photo of [Petitioner].  Prior to viewing the array [Marquez] was
> advised to carefully view each photo and that the suspect may or may not be
> represented within the array.  After approx. 4 second [Marquez] pointed at the
> photo of [Petitioner] and stated that he was the one who put the gun to his head
> and shot his friend.  [Marquez] wrote his name "Augustin" above the photo of
> [Petitioner] as confirmation of this identification.
>
> Upon completion of the viewing of the photo array, [Marquez] was asked if he
> has seen a photo of [Petitioner's] photo in the newspaper (since the time of
> stated that he has seen [Petitioner's] photo in the newspaper (since the time of
> the incident).  At this time, [Marquez] confirmed that during the incident he was
> in close proximity to suspect #2 (within 6 inches) and clearly saw his face during
> the incident.  He then stated that his identification of [Petitioner] is based [on]
> memory of the incident and not for seeing the picture in the paper.

(Id. at 96.)

Thus, in connection with all of his allegations and these police reports, Petitioner claims that his trial counsel should have taken the following actions but failed to do so: object to the perjured testimony; adequately cross-examine these witnesses about their identification of him; and request an appropriate jury instruction that would discuss the factors to consider when determining the reliability of eyewitness identification testimony.  (Doc. No. 1-1 at 38.)  Because trial counsel failed to take these actions, Petitioner alleges that his right to the effective assistance of counsel was violated.  (Id.)

With respect to this claim, the Superior Court stated in its July 6, 2020 decision, as follows:

> In his next issue, [Petitioner] claims that counsel were ineffective for their failure to object to the prosecution's use of false timeline identification testimony. Specifically, [Petitioner] contends that he was only identified by a photo line-up that occurred four days after he was charged and not on the same evening of the crimes as "asserted by the prosecution through witness[es] Augustine Marquez and Arturo Perez" . . . .

> [Petitioner] fails to explain how the fact that witnesses identified him days after the shooting, as opposed to on the day of the crime, "resulted in prejudice" . . . . In fact, multiple witnesses, in addition to Marquez and Perez, positively identified [Petitioner] as the victim's assailant. Because [Petitioner] cannot prove that he suffered prejudice as a result of counsel's alleged action or inaction, . . . [Petitioner] is not entitled to relief on this claim.

(Doc. No. 14-1 at 49.)

The Superior Court concluded that Petitioner could not show that he was prejudiced by trial counsel's inaction with respect to Mr. Perez and Mr. Marquez because other witnesses positively identified Petitioner as the victim's assailant.  Having reviewed the state court record, the Court cannot conclude that the Superior Court's adjudication on the merits was an unreasonable application of Strickland or based upon an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

37

The testimony of Dianne R. Kelso ("Kelso"), an employee of the Chambersburg Police Department at the time of the homicide and accompanying crimes, established that, in addition to Mr. Perez and Mr. Marquez, another witnesses—Genaro Gonzalez Chavez—was shown the same photo array on October 26, 2012, and positively identified Petitioner. (Doc. No. 16-1 at 25–26, 28, 29.) In light of this evidence, it was reasonable for the Superior Court to find no reasonable probability that the result of Petitioner's trial would have been different had trial counsel taken action to ensure that the jury knew that Mr. Perez and Mr. Marquez had not made their identifications until four (4) days after the crime on October 26, 2012.[8] Accordingly, the Court will deny Petitioner's request for habeas relief in Ground Four of his petition.

### 5. Ground Five

In Ground Five of his petition, Petitioner asserts that trial counsel were ineffective for failing to comply with the state procedural requirement for filing a notice of alibi defense and for failing to request an alibi instruction. (Doc. No. 1-1 at 40.) In support of his alibi defense, Petitioner contends that he was "'[p]assed out' on Shauf's couch at the time the crime[s] occurred." (Id.) Petitioner argues, however, that counsel failed to file the requisite notice for his alibi defense and that this failure is why an inadequate investigation was conducted on his "alibi sources" and why trial counsel did not "call, secure, or subpoena" Ms. Schooly, who had placed

---

[8] While not explicitly addressed by the Superior Court, the Court notes that the Commonwealth also presented testimony from Kelso at trial, which acknowledged that there were photos of Petitioner and his co-defendant in the news at some point between October 22, 2012 (the date of the crimes), and October 26, 2012 (the date of the subject photo array). (Doc. No. 16-1 at 27 (containing Kelso's testimony, wherein she confirms the existence of such photos).) Based upon this testimony, the jury was aware that there was reason to question the veracity of the witnesses' identifications of Petitioner and his co-defendant. Ultimately, the jury was free to believe all, some, or none of the witnesses' testimony. See McMichael v. McMichael, 241 A.3d 582, 590 (Pa. 2020) (explaining that "it is the province of the jury to assess the worth of all testimony presented, and the jury is free to believe all, some, or none of the witness testimony presented at trial").

Petitioner "in her home, and sleeping on her couch after drinking all day with co-defendant Shauf." (Id. at 41 (stating that "[Ms.] Schooly was Shauf's girlfriend during that period of time")).)  In addition, Petitioner alleges that counsel's failure to file the notice of his alibi defense was exacerbated by their failure to seek an alibi instruction and to adequately define the prosecution's burden of proof.  (Id.)  In support, Petitioner alleges that his counsel "argued alibi throughout the . . . proceedings, and then failed to at the very least request an alibi instruction at the conclusion of the proceedings."  (Id. at 42.)  Based upon these omissions, Petitioner claims that his right to the effective assistance of counsel was violated.  (Id. at 44.)

The state court record reflects that the trial court (sitting as the PCRA court) rejected this claim (Doc. Nos. 41-1 at 32; 41-2 at 77–91), in pertinent part, as follows:

> Defendant offered alibi evidence at trial.  Witness Eichelberger testified that he had visited [Shauf's] residence between 9:30 p.m. and 9:45 p.m., on October 22, 20212.  During this visit, he had an interaction with Jason Shauf's girlfriend indicating that Defendant was on the ouch inside the residence sleeping:
>
>> Q: [District Attorney] The night of the murder, what time, best you can recall, do you think you saw Carl Varner at Jason Shauf's house?
>>
>> A: [Edward Eichelberger] 9:30, quarter to 10.  Somewhere around there.
>> Q: You saw him or you were told he was there.
>>
>> A: I looked in.  She told me.  I looked in.  It was him.
>
> . . . .  In addition, Defendant testified that he spent the evening at [Shauf's] residence where he slept on the couch after an evening of heavy drinking, and then walked directly to his residence on McKinley Street.
>
> An alibi is defined as "a defense that places the defendant at the relevant time at a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party."  Com. v. Kolenda, 676 A.2d 1187, 1190 (Pa. 1996).  Here, Defendant was entitled to an alibi instruction to alleviate the danger that the jurors might imperssibly view a failure to prove the defense as a sign of Defendant's guilty.  See Com.v. Pounds, 417 A.2d 597, 603 (Pa. 1980).  Witness Eichelberger's testimony alone would not have been sufficient to entitle Defendant to an alibi instruction because he did not testify to Defendant's presence at the exact time of the crimes, but Defendant's testimony

alone is sufficient in the instant matter because he testified to his presence somewhere other than 310 King Street at the time of the crimes. <u>Kolenda</u>, 676 A.2d at 1190 ("[T]he testimony of the accused may be sufficient in itself to raise an abili defense and entitle the defendant to an appropriate jury instruction[.]" There is no minimum threshold quantum of physical separation necessary for a defense to constitute an alibi, so long as the separation makes it impossible for the defendant to have committed the crime. <u>Com. v. Roxberry</u>, 602 A.2d 826, 828 (Pa. 1992). This Court finds that an alibi instruction would have been requested by counsel, so Defendant has satisfied the first prong of <u>Pierce</u> by showing the claim has arguable merit.

As for the second prong of <u>Pierce</u>, the Court analyzed the record in order to determine whether trial counsel's act or omission had a reasonable basis to advance Defendant's interests. <u>Pierce</u>, 786 A.2d at 213. During the PCRA hearing [in April 2018], Attorney Palermo testified that counsel's strategy was to present evidence that the Defendant was elsewhere, but to present it as a general defense, not technically an "alibi defense." At the PCRA hearing, he expressed certainty that they had argued at closing that Defendant was elsewhere when the crimes occurred. At closing, Attorney Palermo had received the testimony by witness Eichelberger that he had seen Defendant just prior to the time of the crime. Attorney Palermo also commented on Defendant's testimony during close:

> "[They] gave [Petitioner] [on his cross examination], like, three different opportunities to implicate somebody else, to put himself somewhere else at different times. [Petitioner] didn't do it. [Petitioner] could have said, No, Mr. Fogal. 10:15 I was passed out urine soaked on the couch because I remember it was 10:15 exactly. [Petitioner] didn't say that. He didn't alibi himself. He said, I was passed out. I don't keep track of time when I'm passed out. He wouldn't give him a time and clear his own name.

. . . . Attorney Weisbrod testified that Attorney Palermo's testimony was accurate and that they intended to argue Defendant was at Jason Shauf's residence both before and after the crimes, but "that left us exposed as to whether we could provide where he was at the very moment or moments that these crimes were alleged ot have occurred . . . [.] This testimony indicates a trial strategy which sought to minimize any inconsistencies raised in the minds of the jury that might have come from the inclusion of an alibi instruction to the jury. Attorney Palermo's testimony about a "back door alibi defense" indicates a strategy to introduce evidence from Defendant and witness Eichelberger without specifically raising an alibi defense.

Defendant cites <u>Mikell</u> claiming that there can be no reasonable basis for counsel to fail to seek an alibi instruction if there are grounds for such an instruction. <u>Com. v. Mikell</u>, 729 A.2d 566, 570 – 571. This Court does not agree. Since

Mikell, the Pennsylvania Supreme Court has rejected a lower court ruling stating that "it is not a reasonable trial strategy to forego an alibi instruction to focus on another defense." Com. v. Hawkins, 894 A.2d 716, 731 (Pa. 2006). It held instead that counsel is only required to have a reasonable basis to not request an alibi instruction. Id. This Court finds that, although counsel could have requested an alibi instruction for the jury, counsel's strategy sought to argue during closing that Defendant was elsewhere and to minimize the inconsistencies that may have been highlighted by such an instruction. For these reasons, the Court finds that Defendant has not demonstrated that counsel lacked a reasonable basis for not pursing an alibi instruction for the jury, and so Defendant has not satisfied the second prong of Pierce.

The Court further finds that Defendant did not suffer actual prejudice as a result of counsel's decision not to seek an alibi instruction at trial. Although Defendant testified that he had been sleeping on [Shauf]'s couch at the time of the crimes and witness Eichelberger testified that he saw Defendant on [Shauf's] couch just prior to the crimes at 310 East King Street, there was overwhelming evidence presented at trial, including eyewitness testimony that placed Defendant at the scene of the crime . . . .

This Court finds that if counsel for Defendant would have sought an alibi instruction for the jury, it would not have changed the outcome of the jury trial. There was overwhelming physical evidence tying [Petitioner] to the crimes at 310 West King Street on October 22, 2012. There were also five witnesses placing [Petitioner] at the scene of the crimes and one witness who identified him with the co-defendant just after the crimes had taken place. This Court finds that an alibi jury instruction would not have changed the outcome of the trial. For these reasons, the Court finds that counsel was not ineffective for failing to request an alibi instruction for the jury.

(Doc. No. 14-1 at 17–22.)

On appeal, the Superior Court affirmed the PCRA court's decision, stating:

Next, [Petitioner] contends that counsel was ineffective for failing to timely file and serve a notice of alibi defense and seek an alibi instruction.

An alibi is "a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party" . . . . When a defendant intends to offer an alibi defense at trial, Pa.R.Crim.P. 567 requires the defendant file a notice of the alibi with the clerk of courts, and serve a copy of the notice and a certificate of service on the attorney for the Commonwealth. See Pa.R.Crim.P. 567(A).

Here, [Petitioner]'s counsel testified that they employed more of a "backdoor" or "quasi"-alibi defense at trial, using [Petitioner]'s testimony as well as a

witness's testimony to place [Petitioner] at Shauf's residence on the night of the crime around 9:30-9:45 PM. While counsel never filed a formal notice of alibi defense or requested an alibi instruction, the jury had the opportunity to consider the evidence to determine whether [Petitioner] was present at the crime scene during the relevant time period. However, even though witness Eichelberger testified that [Petitioner] was sleeping on Shauf's couch just prior to the time the crimes were committed, his testimony did not completely eliminate the possibility that [Petitioner] could have committed the offenses. Under such circumstances, we do not find counsels' failure to serve a notice of alibi or seek an alibi instruction unreasonable, especially where there was overwhelming evidence, including eyewitness testimony, placing [Petitioner] at the scene of the crime. See Commonwealth v. Hawkins, 894 A.2d 716, 730 (Pa. 2006) (court found reasonable basis for failure to seek alibi instruction where counsel explained that "in his twenty years of experience he had come to the conclusion that where alibi testimony is weak, or is predicated on the defendant's testimony alone, calling attention to that testimony explicitly as alibi evidence disserves the defendant's interests") . . . . This claim of ineffectiveness, therefore, is meritless.

(Doc. No. 14-1 at 49–50 (footnote and some internal citations omitted).)

The apparent basis for the Superior Court's rejection of this ineffective assistance claim is that the failure of Petitioner's trial counsel to seek a notice of alibi or alibi instruction was not objectively unreasonable (i.e., did not constitute deficient performance) because there was overwhelming evidence placing Petitioner at the scene of the crime, and because Petitioner's alibi evidence was not excluded by the trial court and, therefore, the jury had the opportunity to consider the testimony of both Petitioner and Eichelberger to determine whether Petitioner was present at the crime scene during the relevant period of time without highlighting any inconsistencies in such testimony by requesting an alibi instruction.  Having reviewed the state court record, and as discussed infra, the Court cannot conclude that the Superior Court's adjudication on the merits was an unreasonable application of Strickland or based upon an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

a.      **Alibi Instruction**

The Court begins its discussion by addressing the Superior Court's decision concerning trial counsel's failure to request an alibi instruction.  The state court record reflects that several of the Commonwealth's witnesses, who were at the scene of the crime, identified Petitioner as the perpetrator who shot the victim, as did Shauf, Petitioner's co-defendant.  See, e.g., (Doc. Nos. 16-1 at 28; 16-2 at 11–12, 17, 25; 16-3 at 24).  In addition, the Commonwealth's evidence presented at trial physically tied Petitioner to the scene of the crime—i.e., police found a .22 revolver and .410 shotgun in Petitioner's residence, both of which were concealed in his basement (Doc. Nos. 16-3 at 25, 26; 16-4 at 10–11); the .22 revolver was determined to be the homicide weapon (Doc. Nos. 16-4 at 46; 16-5 at 23, 24); and the police found a .410 shotgun shell box in Shauf's truck, which matched the .410 shotgun found in Petitioner's basement (Doc. No. 16-4 at 5, 11).

In response to the Commonwealth's evidence presented at trial, Petitioner's counsel presented, inter alia, alibi evidence.  Petitioner testified that, on the night of the crimes (October 22, 2012), he spent the evening at Shauf's residence, after drinking during the day and being on Oxycodone and Xanax.  (Doc. No. 16-5 at 13–16.)  Petitioner testified that he fell asleep on the couch and that, when he woke up, he was "soaking wet" because he had "[u]rinated on [himself]" as a result of the drinking.  (Id. at 16; Doc. No. 1-1 at 13.)   He testified that he then left the residence and walked home (Doc. No. 16-5 at 16), which was about 6:00 a.m. on October 23, 2012 (id. at 21).

In addition to Petitioner's testimony, Eichelberger testified that, on October 22, 2012, he visited Shauf's residence between 9:30 p.m. and 9:45 p.m. and that, although he did not have any contact with Shauf or Petitioner during this visit, he had an interaction with Shauf's girlfriend,

"Molly," whom the Court refers to as Ms. Schooly.  (Id. at 6.)  Eichelberger testified that he

asked Ms. Schooly to get him cigarettes (id.) and that Ms. Schooly stated that she had to wait for

Shauf to return (id. at 7).  Eichelberger testified that he saw Petitioner and that Ms. Schooly

laughed because she thought Petitioner had urinated on himself as a result of being "intoxicated,

drinking."  (Id.)  Eichelberger testified that he left the residence, but returned later that evening,

around 11:20 or 11:30 p.m. to see if Ms. Schooly had gotten him the cigarettes.  (Id.)

Eichelberger testified that Petitioner was still at the residence at this time.  (Id.)

Importantly, however, the state court record reveals that Eichelberger's testimony did not

eliminate the possibility that Petitioner could have committed the offenses.  The Commonwealth

presented Kevin Yearick as a witness, who testified that he saw people running out of 310 East

King Street at approximately 10:00 p.m. on October 22, 2012.  (Doc. No. 16-1 at 19.)  Because

Eichelberger testified that he saw Petitioner at Shauf's residence between 9:30 p.m. and 9:45,

and again around 11:20 or 11:30 p.m., there was a period of time for which Petitioner's

whereabouts were unaccounted.

In addition, during Petitioner's PCRA proceedings, trial counsel revealed the trial

strategy behind their decision to not request an alibi instruction for the jury:

> [Attorney Weisbrod]: I think Mr. Palermo's testimony is probably fairly
> accurate when he characterized [the defense] as a back-door alibi.  We were able
> to bookend [Petitioner] being at the Shauf residence . . . .  But that left us still
> exposed as to whether we could prove where he was at the very moment or
> moments that these crimes were alleged to have occurred[.]

(Doc. No. 16-8 at 76.)  However, trial counsel also explained that the jury was still free to

believe that Petitioner was not at the scene of the crime during the relevant period of time, even

without a specific alibi instruction.  (Id. at 49.)

44

The Court finds that foregoing record supports the Superior Court's adjudication on the merits concerning the reasonableness of trial counsel's strategy to present alibi evidence at trial but to not request a specific alibi instruction for the jury.  Indeed, the period of unaccounted-for-time between the Petitioner and Eichelberger's testimony demonstrates the appropriateness of trial counsel's determination that requesting an alibi instruction might have highlighted alibi testimony and, thus, exposed their defense to this unaccounted-for-time.  See Harrington, 562 U.S. at 109 (explaining that "[t]here is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect" (quotation omitted)); Rolan, 445 F.3d at 681–82 (stating that "counsel's strategic choices will not be second-guessed by post-hoc determinations that a different trial strategy would have fared better"); Nolen v. Meyers, 98 F. App'x 97, 99 (3d Cir. 2004) (unpublished) (concluding that the state court's decision denying post-conviction relief was not contrary to or an unreasonable application of Supreme Court precedent on ineffective assistance of counsel claims under the Sixth Amendment, where trial counsel "made a conscious decision not to pursue an alibi defense based on the inconsistencies in the alibi testimony[,]" believing "that an alibi jury instruction would serve only to highlight these inconsistencies").

### b.    Notice of Alibi

Having addressed the Superior Court's decision concerning trial counsel's failure to request an alibi instruction, the Court briefly addresses the Superior Court's decision concerning trial counsel's failure to file the requisite notice of alibi.  Under Rule 567 of the Pennsylvania Rules of Criminal Procedure, when a criminal defendant intends to offer an alibi defense at trial, the defendant is required to file, within a specified period of time, a notice of alibi with the clerk of court and to serve a copy of the notice and a certificate of service on the Commonwealth.  See

Pa. R. Crim. P. 567(A).  In addition, the Rule instructs that the defendant's notice must "contain specific information as to the place or places where the defendant claims to have been at the time of the alleged offense[,] and the names and addresses of the witnesses whom the defendant intends to call in support of the claim."  See Pa. R. Crim. P. 567(A)(2).  If a defendant fails to file and serve the notice of alibi, as required by the Rule, the trial court may, inter alia, "exclude entirely any evidence offered by the defendant for the purpose of proving the defense, except testimony by the defendant[.]"  See Pa. R. Crim. P. 567(B)(1).

In Petitioner's case, the state court record reflects that Petitioner's trial counsel did not file a notice to present an alibi defense.  (Doc. No. 14-1 at 17.)  However, the state court record reveals that, despite trial counsel's failure to do so, the trial court did not exclude alibi testimony and did not instruct the jury to disregard such alibi testimony.  Thus, whether this ineffective assistance claim is reviewed under AEDPA's deferential standard, see 28 U.S.C. § 2254(d), or under de novo review, see 28 U.S.C. § 2254(a), it fails because the failure of trial counsel to file a notice of alibi cannot reasonably be deemed prejudicial where alibi evidence was presented at Petitioner's trial.   In other words, because the jury had the opportunity to assess and consider such alibi evidence in order to determine whether Petitioner was physically present at the scene of the crime during the relevant period of time, there is no "reasonable probability" that, if not for trial counsel's errors, the result of his trial "would have been different."  See Rogers, 80 F.4th at 694; Strickland, 466 U.S. at 687 (explaining that, under the second prong of ineffective assistance of counsel claims under the Sixth Amendment, a petitioner must show that counsel's "deficient performance prejudiced [his] defense").  For all of the foregoing reasons, the Court will deny Petitioner's request for habeas relief in Ground Five of his petition.

### 6.      Ground Six

In Ground Six of his petition, Petitioner asserts that his trial counsel were ineffective for failing to object to the prosecution's presentation of inadmissible testimony of Petitioner's "other crimes, prior bad acts, and mental health stability." (Doc. No. 1-1 at 45.)  In support, Petitioner points to the fact that the prosecution presented the "unredacted version" of Shauf's videotaped interview, which covered a wide range of subject matter irrelevant to the case (id.), making him appear "as a derranged [sic] murderer with a short temper, who is ultimately mentally unstable" (id. at 48).  Thus, Petitioner contends that trial counsel should have challenged the introduction of this prejudicial evidence (id.) or, at the every least, should have suggested a limiting instruction about the purpose for which the jury may have considered the testimony (id. at 49).  Because, however, trial counsel did not do so, Petitioner contends that his right to the effective assistance of counsel was violated.  (Id.)

The state court record reflects that, with respect to this ineffective assistance claim, the Superior Court found, as follows:

> In his next issue, [Petitioner] asserts that counsel were ineffective for failing to object to the improper admission of his prior bad acts, crimes, and mental health issues, all of which were part of Shauf's un-redacted video interrogation. At the PCRA hearing, [Petitioner] testified that he did not ask counsel to object to the use of Shauf's unredacted video and, in fact, at trial, did not want counsel to object to its use because he did not want to have a mistrial declared . . . . [Petitioner] cannot now claim counsel was ineffective when he specifically told counsel not to object to the admission of such evidence.

(Doc. No. 14-1 at 51.)

The Court concludes the Superior Court did not unreasonably apply Strickland or base its decision on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  Strickland explains that counsel's function in representing a criminal defendant includes, inter alia, "particular duties to consult with the defendant on important decisions . . . . "  See Strickland,

466 U.S. at 688.   The Superior Court's conclusion that trial counsel decided not to object based

upon such consultation is supported by Petitioner's testimony on this issue in the PCRA court:

> Q      At any point in time, did you ask your attorneys to object to the information that [Shauf] was saying during the interview about your criminal history, your mental health?
>
> A      I let them run it after things got going.  I doubt if I said anything.
>
> Q      I guess that while the interview was playing, did you raise any concerns to your attorneys?
>
> A      Other than I said, Oh, like that.  Just got a response.  But when they started talking about my past history, only thing I was . . . because I knew that was—everybody knew that's illegal for them to do.
>
> Q      You didn't write down, [p]lease object, [a]re you gong [sic] to object, anything like that?
>
> A      No, I didn't.
>
> Q      Anything else regarding the video interview of [Shauf] that you wish for the Court to know?
>
> A      I think I do remember because my stepfather was here.  He was dying of cancer.  My mother just died.  I know there was a mistrial.  I believe I told, Mike, please don't object because it will be a mistrial.  My dad is dying.  He wants me to take him out west to die.
>
> Q      You recall asking them not to object?
>
> A      I think I did.  I'm pretty sure I asked them not to object to it at the time.  Or that was in my mind anyway when I said, Oh.  I know it was mistrial automatically.  I didn't want—he didn't last.  He died before—right after trial anyway.

 (Doc. No. 16-7 at 80–81.)  Accordingly, the Court will deny Petitioner's request for habeas

relief in Ground Six of his petition.

### 7.      Ground Seven

In Ground Seven of his petition, Petitioner asserts that trial counsel were ineffective for failing to "assure [his] right to a fair and impartial state court jury." (Doc. No. 1-1 at 51.) In support, Petitioner alleges that trial counsel were ineffective for failing to object to the seating of Juror number two (2), Mrs. Debra Nay ("Mrs. Nay"). (Id.) The state court record reflects that, after Mrs. Nay had been selected for the jury, she realized that she recognized Shauf, and she promptly brought this to the trial court's attention. (Doc. No. 16-1 at 4.) The state court record further reflects that, upon learning of the issue of potential bias, the trial judge and defense counsel for Shauf questioned Mrs. Nay in the presence of the prosecutor and Petitioner's counsel, prior to the opening statements at Petitioner's trial. (Id. at 4–5.) Mrs. Nay confirmed that she and her husband had given Shauf a deposit to do some work on their home and that they then had difficulty with Shauf completing the work. (Id. at 4 (explaining that her husband and neighbor had to complete the work).) Mrs. Nay also confirmed that this incident occurred over two (2) years prior to the start of trial. (Id.) However, Mrs. Nay represented, on several occasions, that she believed she could serve as an impartial juror in the case. (Id. at 4–5.) At no point did Mrs. Nay state or suggest that she knew Petitioner or had any prior interactions with Petitioner, as she did with Shauf. See (id.). Ultimately, defense counsel did not move to have the juror excused, and she remained on the jury. (Id. at 5.)

At the PCRA hearing, Attorney Palmero addressed this ineffective assistance claim by testifying, as follows:

> Q.      Just regarding briefly the issue about the juror.
>
> A.      Okay.
>
> Q.      Do you recall the juror who made it known to the Court that she had a prior involvement with [Shauf]?

A.    She was ripped off by him, yes.

Q.    Yes. Correct.

A.    Yes, I recall.

Q.    Were you ever made aware of any additional information in a Ripoff report that was posted online regarding that?

A.    I don't believe I was.

Q.    Okay.

A.    I wasn't afraid of that juror.  We wanted that juror.

     THE COURT:      What?

     THE WITNESS:    We weren't afraid of that juror.  We wanted that juror.

Q.    Why did you want her?

A.    Because she knew [Shauf] was a scumbag and cheat.

Q.    Beneficial to [Petitioner]?

A.    Forwarded into theory.

(Doc. No. 16-8 at 53–54.)  Attorney Weisbrod also addressed this ineffective assistance

claim at the PCRA hearing by testifying, as follows:

Q.    Okay.  The last issue that I just wanted to ask your input on was about the juror who claimed she had a prior relationship with [Shauf] because of a poor business dealing.  Do you recall that?

A.    I do.

Q.    And did you feel that juror, as [Attorney] Palermo did, was beneficial to your case?

A.    We did.

Q.    Okay. So you wouldn't have had any reason to request that she be excused from testifying?

A.      We had a conversation I believe with [Petitioner] about that and our reasoning for wanting to keep . . . her on the jury.  We knew what he was going to say about [Petitioner], what he had already said in his police interview about [Petitioner]. We wanted somebody on there to say, You can't believe a word that comes out of this guys' mouth.

Q.      You didn't . . . see any reason to request that juror be excused?

A.      On the contrary.

Q.      You had a conversation with [Petitioner] about keeping that juror on; is that accurate?

A.      Yeah. We had that conversation.

Q.      Did he appear to agree with that conversation, with that decision?

A.      I can't remember how he viewed the decision. His only concern, as he testified, Man, you know, I used to help [Shauf] every once in a while.  I go to the places. I don't know if she knows me or if I know her.  That was his concern.

Q.      I don't believe that there were any questions about [Petitioner] during the in-chambers questioning of that juror.  Do you recall?

A.      I don't recall there were either.

Q.      Did you know at that time that [Petitioner] may have been known to the juror?

A.      I did not have–he couldn't even tell me that he was.

Q.      So based on your interaction with the juror and interaction she had with [Shauf], you thought it was strategically in [Petitioner]'s interest to have her remain on the jury.

A.      If we wanted the jury to believe Mr. Shauf was a liar, yeah.

(Id. at 81–82.)

        Petitioner ultimately appealed the PCRA court's denial of this ineffective assistance claim to the Superior Court, which concluded, as follows:

51

> With regard to his eighth issue on appeal, [Petitioner] contends that counsel was ineffective for failing to object to the seating of Juror #2. At the PCRA hearing, counsel testified that Juror #2 had a prior relationship with Shauf "because of a poor business dealing" . . . . In determining not to object to the juror being empaneled, counsel explained that he had a full conversation with [Petitioner] that it was in [Petitioner]'s best interest to keep her on the jury so the defense could convince "the jury to believe that [Shauf] was a liar." Id. at 212. Because the strategy pursued by counsel was reasonable, [Petitioner]'s ineffectiveness claim fails. Spotz, supra; Commonwealth v. Koehler, 36 A.3d 121 (Pa. 2012) (generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose particular course that had some reasonable basis designed to effectuate client's interests).

(Doc. No. 14-1 at 51–52.)

Accordingly, the basis for the Superior Court's rejection of this ineffective assistance claim is that trial counsel had a reasonable strategy for not opposing Mrs. Nay's dismissal from the panel and that, therefore, trial counsel's performance could not be deemed deficient. The Court cannot conclude that the Superior Court's adjudication on the merits was an unreasonable application of Strickland or based upon an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). See 28 U.S.C. § 2254(d).

The state court record establishes that Petitioner's trial counsel believed that it was in his best interest to retain Mrs. Nay on the jury panel because trial counsel wanted to, essentially, portray Shauf—who had testified against Petitioner at trial—as a liar and a cheat and who could not be believed. (Doc. No. 16-8 at 53–54, 81–82.) Therefore, given that Mrs. Nay had a prior negative encounter with Shauf, trial counsel believed that keeping Mrs. Nay on the jury panel would help convince the jury (or at least Mrs. Nay) of this theory. However, regardless of whether this trial strategy would be, or was, ultimately successful, the Court cannot conclude that the Superior Court unreasonably applied Strickland where the state court record establishes that the trial court's probing examination of Mrs. Nay revealed no basis for disqualification. See generally Smith v. Phillips, 455 U.S. 209, 217 (1982) ("Smith") (concluding that that there was

an insufficient basis for a due process violation because "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias[,]" and explaining that the post-trial hearing held by the trial court was sufficient for this purpose because "due process does not require a new trial every time a juror has been placed in a potentially compromising situation"); see also Shauf v. Marsh, No. 1:19-cv-01911, 2022 WL 178815, at *8 (M.D. Pa. Jan. 19, 2022), certificate of appealability denied sub nom. Shauf v. Superintendent Benner Twp. SCI, No. 22-1301, 2022 WL 18861861 (3d Cir. Aug. 26, 2022) (denying Shauf's ineffective assistance claim on the basis that his trial counsel failed to move to dismiss Mrs. Nay as a juror, and explaining that "it is clear that the manner in which the state court conducted its review is congruous with, and a proper and reasonable application of, the clearly established Supreme Court law applicable to actual juror bias"); Strickland, 466 U.S. at 689 (explaining that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" (citation and internal quotation marks omitted)).

Relying on Smith, supra, Petitioner argues that the law imputes bias to Mrs. Nay categorically and that, therefore, there can be no doubt that the trial court would have excused her from the jury panel had trial counsel objected. (Doc. No. 1-1 at 54.) In Smith, Justice O'Connor's concurrence contemplated "some extreme situations that would justify a finding of implied bias[,]" such as "the juror is an actual employee of the prosecuting agency[,] the juror is a close relative of one of the participants in the trial or the criminal transaction[, or] the juror was a witness or somehow involved in the criminal transaction." See Smith, 455 U.S. at 222 (O'Connor, J., concurring). However, none of these extreme situations are present here. As a

result, Petitioner has not established that Mrs. Nay would have been excused for implied bias under Smith.

In addition, the Court notes that Smith instructed that the general remedy for an allegation of juror partiality is the opportunity to demonstrate actual bias.  See id. at 215–18, 223 (containing majority opinion).  And, here, the state court record shows that the trial court adequately questioned Mrs. Nay prior to the start of Petitioner's trial and ultimately found no basis for excusing her for actual bias.  Moreover, the Smith Court emphasized that, in habeas proceedings, a state court's finding regarding a juror's impartiality is presumptively correct under Section 2254.  See id. at 218 (stating, as follows: "federal courts in such proceedings must not disturb the findings of state courts unless the federal habeas court articulates some basis for disarming such findings of the statutory presumption that they are correct and may be overcome only by convincing evidence").

Accordingly, for all of these reasons, the Court concludes that the state court's determination should not be disturbed.  See 28 U.S.C. § 2254(d).  The Court will, therefore, deny Petitioner's request for habeas relief in Ground Seven of his petition.

### 8.    Ground Eight

In Ground Eight of his petition, Petitioner asserts that trial counsel were ineffective for failing to object to the prosecutor's improper and prejudicial remarks during closing argument or for otherwise failing to request a curative admonition.  (Doc. No. 1-1 at 56.)  In support, Petitioner references four (4) instances in which he believes that the prosecution sought to inflame the prejudices of the jury.  (Id. at 56, 60.)  First, Petitioner points to the prosecutor's remark that Petitioner and Shauf are "wolves who prey on 98% of the world, who are sheep[.]" (Id. at 56.)  Second, Petitioner points to the prosecutor's remark that the "police don't plant

evidence[.]"  (Id.)  Third, Petitioner points to the prosecutor's reference to the 9/11 tragedy, which insinuated "that Petitioner and Shauf are somehow terrorists[.]"  (Id. at 56–57.)  And, finally, Petitioner points to the prosecutor's suggestion that Petitioner conceded to committing the crime.  (Id.)  Petitioner argues that his counsel's inaction allowed the prosecution to present irrelevant or inflammatory rhetoric that diverted the jury's attention from its proper role.  (Id. at 59.)  Petitioner further argues that, had his counsel objected or otherwise requested a curative admonition, "there is a reasonable probability that the jury would have rendered another verdict[.]"  (Id. at 61.)  As a result, Petitioner contends that his right to the effective assistance of counsel was violated.  (Id.)

The Court recounts the prosecutor's relevant remarks during closing argument below:

> These guys look different than they did.  I asked a lot of questions of the witnesses about how these guys looked.  Shauf, just heavier.  He looks essentially the same.
>
> This guy, he looks markedly different.  This sort of look, sort of junior-high-shop-teacher look is markedly different than what he looked like on October 22nd.  You saw him in the interview.  You saw the pictures.  He looked markedly different.  Whatever impression is maybe trying to be made is not [Petitioner]. What you're looking at is not [Petitioner].
>
> The two big things, two big items of truth are this: Varner murdered Hugo.  Even he says that.  Shauf was upstairs in Bedroom 1 . . .
>
> If you believe Shauf completely to the extent he minimizes his own activities, [Petitioner] went upstairs.  Think about this.  Want to break it down piece by piece . . . .
>
> ****
>
> There's three kinds of people in the world. In my military experience, I've heard a lot of illustrations. I think this is useful today. There's three types of people. First are sheep. It's about 98 percent of the population.
>
> I don't know all of you personally. I suspect most, if not all of you, are sheep. That's not a pejorative term at all. It's someone who has a prosocial behavior, who lives their lives to benefit others, to stay peaceful, mind their own business,

do their job, support their friends and family, keep their nose clean, don't have much interaction with criminals and evil. Most people, about 98 percent.

There's 1 percent who are wolves. They prey on the sheep. That's either something that law enforcement has to deal with or the military. There's 1 percent out there whose jobs in their minds is to prey on the sheep, someone weaker and not prepared to meet the challenge, defend themselves.

Thankfully, there's another 1 percent. Sheepdogs. The sheepdogs' job is to protect the sheep. They fight the wolf. They're kind of similar sometimes—and they have to be—in the sense the violence the wolf brings to the sheep has to be met with violence to meet that, right? The difference between the two is right here. It's integrity, and it's morality.

I saw a picture once of a man, a Port Authority officer. He was standing on Ground Zero on September 11th, 2001. He's covered in dust. And he has three civilians around him all covered in dust. You look at his face. You can't find his face on the Internet. I was shown his face in the context of this illustration. Abject fear. Not a movie. It's not an actor. Look at the fear. It's abject fear.

He's been up in the tower one, two, three times already. Ground Zero, New York. September 11th. People he just hustled out of the building. People jumping out on fire, smoke everywhere. He's been up there three times in the tower. Back down. Covered in dust.

That was after his third trip in the building. He went in a fourth time. He didn't come out. He didn't do that because he was tough, masculine, full of testosterone. That officer did that out of love, out of love for the sheep, for the flock, for the morality involved in that.

It is disgusting for these two, both of them, to denigrate this community's police officers and say they planted evidence so we could happen to pin a murder on someone. It's disgusting.

If you want to believe cops planted evidence in this case for some reason to nail these two for some vendetta they may have for some reason, acquit them.  If that's what you think happened, acquit them . . . .

(Doc. No. 16-6 at 31–32 (emphasis added).)

In addition, the state court record reflects that, before the trial court gave its final instructions to the jury, Petitioner's counsel requested a curative instruction on the basis that the prosecutor had argued facts not in evidence when he asserted that Petitioner had implied that the

police had planted evidence.  (Doc. No. 16-6 at 43–44.)  The trial court denied the request,

explaining that the prosecutor made this implication based upon Petitioner's response to the

prosecution questioning him during the trial and that, ultimately, it was for the jury to decide

whether or not they agreed with the prosecutor's implication.  (Id. at 44); see also (Doc. No. 16-5

at 23 (providing an exchange between Petitioner and the prosecutor concerning whether

Petitioner was implying that the police had planted the weapons in his house)).

      With respect to this ineffective assistance claim, the trial court (sitting as the PCRA

court), stated as follows:

> Defendant claims the prosecutor engaged in misconduct and caused undue
> prejudice by failing to provide exculpatory and impeachment evidence, making
> improper comments during the trial, using false and misleading statements in
> the affidavit of probable cause for the search warrant, and the use of photo of
> the deceased in the opening, direct, and closing.
>
>             * * * *
>
> Defendant has provided no evidence for the accusations of prosecutorial
> misconduct.  Without evidence to substantiate the accusations of perceived
> wrongs, this Court finds these claims are without merit.  Defendant received a
> fair trial and was represented by capable counsel and this Court finds no
> evidence that the Commonwealth acted improperly.
>
> In addition, Defendant had an opportunity to make this claim before this PCRA
> petition, but did not, so the claim is waived.  An issue is waived "if the petitioner
> could have raised it but failed to do so before trial . . . on appeal, or in a prior
> state postconviction proceeding."  42 Pa.C.S. § 9544(b).

(Doc. No. 14-1 at 36–37.)

      Petitioner appealed the PCRA court's decision to the Superior Court, which found as

follows:

> Finally, [Petitioner] contends that the PCRA court abused its discretion when it
> determined that [Petitioner] failed to raise prosecutorial misconduct issues and
> that those issues are now waived, especially "when the court assured [Petitioner]
> and PCRA counsel that the prosecutorial misconduct issues raised by
> [Petitioner] would be reviewed and considered within the PCRA court's opinion,

and the PCRA court ultimately failed to issue any robust determination which would enable effective appellate review" . . . .

Having independently reviewed the record, including the notes of testimony from the PCRA hearings, we conclude that there is no merit to [Petitioner] prosecutorial misconduct issues. See Commonwealth v. Tedford, 960 A.2d 1, 29 (Pa. 2008) ("In order to obtain relief for alleged prosecutorial 'misconduct,' a petitioner must first demonstrate that the prosecutor's action violated some statutorily or constitutionally protected right.") (citation omitted). Therefore, the court did not abuse its discretion in finding those meritless issues waived.

(Doc. No. 14-1 at 55.)

Accordingly, the Superior Court did not address Petitioner's instant ineffective assistance claim, but instead addressed Petitioner's prosecutorial misconduct claim on the merits. See (id.). However, while the Superior Court did not address Petitioner's ineffective assistance claim directly, its adjudication on the merits of Petitioner's prosecutorial misconduct claim is subject to AEDPA's deference under Section 2254(d). And if the Superior Court's decision passes muster under Section 2254(d), the Court would be precluded from granting relief on Petitioner's ineffective assistance claim. See Lam v. Kelchner, 304 F.3d 256, 273 (3d Cir. 2002) (explaining that petitioner failed to show prejudice from trial counsel's failure to object to prosecutor's vouching where state court considered and rejected vouching claim on the merits and did not unreasonably apply clearly established federal law). The Court will, therefore, address whether the Superior Court unreasonably applied clearly established federal law concerning prosecutorial misconduct or unreasonably determined the facts in finding that Petitioner's prosecutorial misconduct claims lacked merit.

The clearly established federal law concerning prosecutorial misconduct in a closing argument is set forth in Darden v. Wainwright, 477 U.S. 168 (1986). In that case, the United States Supreme Court explained that, on federal habeas corpus review, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." See id. at 181 (citation

and internal quotation marks omitted).  Instead, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  See id. (citation and internal quotation marks omitted).  In answering this question, courts may look to various factors, including, whether the prosecutors' comments were "invited by" or "responsive to" defense arguments, whether any curative instructions were given to the jury, and the weight of the evidence that was presented against the petitioner.  See id. at 182.  Finally, the appropriate standard on federal habeas corpus review for such a claim "is the narrow one of due process, and not the broad exercise of supervisory power."  See id. (citation and internal quotation marks omitted).

Even if the Court were to conclude that any of the prosecutor's arguments were improper, the Court finds, for several reasons, that Petitioner has failed to demonstrate that those remarks during closing argument so infected Petitioner's trial with unfairness that it rendered his resulting convictions a denial of due process.  See id. at 181; Morton v. Ricci, 338 F. App'x 182, 185 (3d Cir. 2009) (unpublished) (observing that, in order "to render a trial unfair, it is not enough that the prosecutors' remarks were undesirable or even universally condemned[,]" and instead, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process" (citation and internal quotation marks omitted)).

First, although the trial court did not provide any curative instructions to the jury as to these remarks, the trial court specifically instructed the jurors before they heard closing arguments that: the attorneys' arguments are not evidence; the jurors should not consider the attorneys' arguments as evidence; and, while the jurors should carefully consider the evidence in

light of the various arguments presented by the attorneys, the jurors were not required to accept the arguments of any attorney.  (Doc. No. 16-6 at 3.)

Second, some of the prosecutor's remarks (i.e., remarks concerning the police and the Port Authority officer at Ground Zero on September 11th) were "invited by" or "responsive to" Petitioner's testimony (Doc. Nos. 16-5 at 23; 16-6 at 44), which arguably insinuated that the police had planted evidence.  See Darden, 477 U.S. at 181; Com. v. Kelly, 465 A.2d 1301, 1304 (Pa. Super. Ct. 1983) (stating that "[i]t is clear that the prosecution may, in closing argument, attempt to meet the arguments made by defense counsel in his summation" (citing Commonwealth v. Van Cliff, 397 A.2d 1173 (Pa. 1979))).

Third, the evidence presented against Petitioner at trial, which allowed the jury to reach a finding of guilt, was overwhelming.  It included eyewitness testimony identifying Petitioner as the individual who shot the homicide victim, as well as the discovery of the homicide weapon in Petitioner's residence.  Such overwhelming evidence "reduced the likelihood that the jury's decision was influenced by" the prosecutor's remarks.  See Darden, 477 U.S. at 182.

Finally, as for the prosecutor's remark which allegedly suggested that Petitioner conceded to committing the crime (i.e., when the prosecutor stated, "[e]ven he says that" (Doc. No. 16-6 at 31)), the Court finds that the state court record shows a reasonable basis for the Superior Court's conclusion that Petitioner's prosecutorial misconduct claim was meritless. When reviewed in toto, the state court record establishes that the jury would have understood that the prosecutor was referring to Shauf, Petitioner's co-defendant, and not Petitioner, when the prosecutor made this remark.  Indeed, the transcript from the trial reveals—in relevant part—that Shauf testified against Petitioner, implicating him in the various crimes at the Chambersburg residence on October 22, 2012.  (Doc. No. 16-5 at 34–37.)  The transcript further reveals that

Shauf's testimony was in direct conflict with Petitioner's testimony, which made clear (at face value) that he was at Shauf's residence when those crimes occurred. (Id. at 16.) Thus, given this plain distinction in Shauf and Petitioner's testimony at trial, and in light of the context of the trial as a whole, the record confirms that the jury would have understood that the prosecutor's one-off remark was referring to Shauf.

Thus, for all of these reasons, the Court cannot conclude that the Superior Court's adjudication on the prosecutorial misconduct claim was an unreasonable application of Darden or based upon an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Accordingly, the Court will deny Petitioner's request for habeas relief in Ground Eight of his petition.

### 9. Ground Nine

The final ground for relief that Petitioner asserts in his Section 2254 petition is based upon the cumulative error doctrine. (Doc. No. 1-1 at 63.) More specifically, Petitioner requests that the Court find that counsel's performance was deficient on all of the individual claims, thus satisfying the first prong of Strickland, and that these deficiencies can be aggregated to show that they prejudiced Petitioner's defense, thus satisfying the second prong of Strickland. (Id. at 63.) In support, Petitioner argues that these errors, at the very least, have deprived him of a fundamentally fair trial in violation of his right to the effective assistance of counsel. (Id. at 65.)

The state court record reflects that neither the trial court (sitting as the PCRA court) nor the Superior Court addressed Petitioner's standalone claim of cumulative error. See (Doc. No. 14-1 at 1–40 (containing trial court's opinion); id. at 41–56 (containing Superior Court's opinion)). Thus, because the state courts did not address this claim, no deference is owed to the state courts under Section 2254(d). See 28 U.S.C. § 2254(d).

61

Nevertheless, the Third Circuit has held that a state prisoner's claim of cumulative error is subject to the requirement of exhaustion of state court remedies.  See Collins, 742 F.3d at 542–43.  Assuming arguendo that Petitioner properly exhausted his claim of cumulative error at the state court level (Doc. Nos. 41-1 at 7, 94 (containing Petitioner's pro se PCRA petition and pro se amended PCRA petition); 41-2 at 133 (containing Petitioner's brief on appeal to the Superior Court)), the Court ultimately finds that his claim of cumulative error is without merit.  See 28 U.S.C. § 2254(b)(2) (providing that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

Turning to the cumulative error doctrine, the Court observes that, in a non-precedential opinion in 2020, the Third Circuit stated that it has "not yet decided whether any prejudice from multiple claims of deficient performance should be analyzed together under Strickland or as cumulative error under the Due Process Clause."  See Zeledjieski v. Superintendent Greene SCI, 833 F. App'x 950, 957 (3d Cir. 2020) (unpublished).   The Court also observes that, in support of Petitioner's cumulative error claim, he has cited to Collins, 742 F.3d at 542 to argue that the Third Circuit has recognized the cumulative error doctrine in a state prisoner's habeas proceedings.  (Doc. No. 1-1 at 63.)  In that case, the Third Circuit explained, as follows:

> "Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice."

See Collins, 742 F.3d at 542 (emphasis added) (quoting Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008)).  Accordingly, the Court conducts its cumulative error analysis in relation to the Due

Process Clause of the Fourteenth Amendment.  See Albrecht v. Horn, 485 F.3d 103, 138–39 (3d Cir. 2007) (addressing state prisoner's habeas claim that he was denied due process pursuant to the cumulative prejudice doctrine where errors included trial counsel's failing to seek a limiting instruction).

As explained by the Third Circuit, "a cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless[.]"  See Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007) (citation and internal quotation marks omitted)).  "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice."  Fahy, 516 F.3d at 205 (citations and internal quotation marks omitted); accord Albrecht, 485 F.3d at 139 (stating that this "means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice" (citation and internal quotation marks omitted)).

As discussed above, this Court concludes that the Superior Court's conclusions on Petitioner's various habeas claims were: (1) not an "unreasonable application" of clearly established federal law (i.e., Strickland and Darden); (2) not an "unreasonable determination" of the facts in light of the evidence presented in state court; or (3) fail on de novo review.  See 28 U.S.C. § 2254.  Consequently, there are no individual errors, and, thus, no individual errors to combine.  Accordingly, because there are no such errors to combine, it cannot be said that any cumulative prejudice resulting from any errors undermined the fundamental fairness of

Petitioner's trial or denied him due process.  See Collins, 742 F.3d at 542.  Petitioner's Section 2254 petition will, therefore, be denied.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny the instant petition for a writ of habeas corpus.  In addition, the Court will not issue a certificate of appealability because Petitioner has not made a substantial showing of the denial of a constitutional right and reasonable jurists would not find the Court's assessment of his constitutional claims debatable or wrong.  See 28 U.S.C. § 2253(c)(2) (providing that "[a]certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right"); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (explaining that, where a district court has rejected a constitutional claim on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong").  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania